775 A.2d 406

**Jerrod Leroy THOMAS**

v.

**STATE of Maryland.**

**No. 205, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

July 2, 2001.

190

192

Mark Colvin, Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Rachel Marblestone Kamins, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore and Marna McLendon, State's Attorney for Howard County, Ellicott City, on the brief), for appellee.

Submitted before SONNER, KENNEY and ROBERT F. FISCHER (retired, specially assigned) JJ.

SONNER, Judge.

A jury in the Circuit Court for Howard County convicted appellant, Jerrod Leroy Thomas ("Thomas"), of distribution of cocaine and possession of cocaine. Thomas raises five issues on appeal, including his claim that the circuit court erred when it refused to ask a proposed voir dire question designed to discover a potential juror's unfitness to serve on a jury because of "strong feelings regarding violations of the narcotics laws." On that issue, we reverse. In response to the other issues raised by appellant, we affirm the circuit court.[1]

At the hearing on Thomas's suppression motion, Det. Joshua Burgoon was the sole witness. Detective Burgoon testified that, on December 11, 1998, he participated in his first undercover drug purchase, which resulted in Thomas's arrest.

The transaction began when an informant named Emery Murry[2] ("Murry") contacted Det. Burgoon and said that Cheryl Carter ("Carter") was selling cocaine in the Laurel area. Detective Burgoon asked Murry to arrange a drug buy at the Crown gas station at All Saints Road and Rt. 216. He chose this location because he knew it was well lit with high pressure sodium bulbs and was next door to a well lit food store parking lot.

Murry arranged the purchase and, with Det. Burgoon, drove to the Crown gas station in an unmarked police car. Following Det. Burgoon's instructions, Murry left the car and went into the Crown station store when Carter arrived. A male passenger left Carter's car and walked to a phone booth. Detective Burgoon approached Carter and asked if she had anything for him. She pointed to the man at the pay phone, and Det. Burgoon walked to the male passenger. The man at the pay phone immediately produced a bag of what appeared to be crack cocaine.

---

1. We address three of the four remaining issues raised by appellant. We do not find it necessary to address appellant's claim that the circuit court erred when it refused to strike Juror No. 23 for cause.

2. At times, spelled "Murray."

Detective Burgoon asked for the price of the cocaine and the man responded $225.00. When Det. Burgoon mistakenly gave him only $75.00, the man curtly reminded him of the price and Det. Burgoon produced the remainder. Detective Burgoon then asked about contacting the seller again, and the man indicated that all contacts were to be made through Murry. The man then returned to Carter's car and he and Carter drove away.

According to Det. Burgoon, the entire transaction took three or four minutes, during which he was "focused on the person who had just dealt [him] the crack cocaine." The two men were within arm's length of the pay phone and directly under a lamp. Detective Burgoon admitted that he was "very frightened" because this was his first undercover transaction and he had expected to confront a woman, not a "very large male."

After the car drove away, Det. Burgoon asked Murry the identity of the man who sold him the cocaine. Murry did not remember the man's last name, but said that his first name was Jerrod. A day or two later, Murry supplied Thomas's last name. Detective Burgoon ran a criminal history and Motor Vehicle Administration (MVA) record check on Jerrod Thomas. The latter resulted in a report of a physical description that matched the man who had sold him the cocaine, so he requested a fax of Thomas's MVA photograph. When it arrived, on January 27, 1999, Det. Burgoon "immediately recognized" the photograph of Thomas as the man who sold him the cocaine at the Crown station.

At trial, Det. Burgoon provided similar testimony and identified Thomas in court as the man who had sold him cocaine. Two chemists testified for the State and established that the material submitted by Det. Burgoon was, in fact, crack cocaine.

## I. Voir Dire

Thomas first claims that the circuit court erred when it denied his request to ask two additional voir dire questions.

The questions appeared as "Question No. 5" and "Question No. 10" on Thomas's list of proposed voir dire questions. Question No. 5 asked the circuit court to inquire of the venire:

Has any prospective juror or any member of your immediate family ever been employed by or associated with any municipal, state, or federal police force, law enforcement agency, prosecutor's office, public defender's office, or other law office of any type? [3]

Question No. 10 asked:

Does any member of the jury panel have such strong feelings regarding violations of the narcotics laws that it would be difficult for you to fairly and impartially weigh the facts at a trial where narcotics violations have been alleged?

The circuit court explained its denial of Thomas's requested inquiries by stating, "I think they were fairly covered by other questions, or the Court does not find it necessary to ask those questions."

## A.

Article XXI of the Maryland Declaration of Rights guarantees the right to an impartial jury to every criminal

---

3. Defense counsel offered to change the wording of Question No. 5 to include a follow-up inquiry regarding the juror's ability to be fair and impartial. The following colloquy illustrates the proposed change:

[THE COURT]: All right. [Are] there any other questions?
[DEFENSE COUNSEL]: Yes, I have some.
Your Honor, the Court did not ask my Question No. 5 about whether any of these folks or their immediate family had ever been employed by or associated with any Municipal, State, or Federal Police Force, law enforcement agency, Prosecutor Office, Public Defender's Office, or other type of law office. I believe that question leads to grounds for cause in that they would be inclined to favor the prosecution over the defense. If there is something about the wording of that question that the Court doesn't like, I would certainly ask that the Court rephrase it, such that if the Court doesn't think it goes to challenge for cause as drafted, I would ask that it be rephrased in such a way as to satisfy the objection but in the subject matter. I think the subject matter gives rise to challenge for cause and they should at least be asked if there is anything about those types of relationships that they feel might cause them to have difficulty rendering a fair and impartial verdict in this case. So I would take exception to that.

defendant. Md.Code (1981 Repl.Vol.) Const., Art. 21; *Dingle v. State,* 361 Md. 1, 9, 759 A.2d 819 (2000). "Voir dire, the process by which prospective jurors are examined to determine whether cause for disqualification exists," is the instrument that fulfills that guarantee. *Dingle,* 361 Md. at 9, 759 A.2d 819. "[T]he purpose of the voir dire examination is to exclude from the venire those potential jurors for whom there exists cause for disqualification, so that the jury that remains is 'capable of deciding the matter before [it] based solely upon the facts presented, "uninfluenced by any extraneous considerations." ' " *Hill v. State,* 339 Md. 275, 279, 661 A.2d 1164 (1995) (quoting *Langley v. State,* 281 Md. 337, 340, 378 A.2d 1338 (1977), in turn quoting *Waters v. State,* 51 Md. 430, 436 (1879)). "The common law of this State vests trial judges with discretion to regulate voir dire. The trial judge typically questions the prospective jurors, although he or she has discretion to permit counsel to conduct the inquiry." *Davis v. State,* 333 Md. 27, 34, 633 A.2d 867 (1993).

As Maryland law has developed thus far, a trial judge must examine only two mandatory topics when conducting voir dire. A trial judge must pose questions to the venire that will: (1) determine whether prospective jurors meet the minimum statutory qualifications for jury service, and (2) discover the state of mind of the juror in respect to the matter at hand or any collateral matter reasonably likely to influence the juror's duty unduly. *Boyd v. State,* 341 Md. 431, 436, 671 A.2d 33 (1996). If, in the sound discretion of the trial judge, a question does not appear to address one of the two mandatory areas of inquiry, then the trial judge's decision to pose the question to the venire is guided by the common law rule that "the purpose of 'the inquiry is to ascertain "the existence of cause for disqualification and for no other purpose." ' " *Davis,* 333 Md. at 34, 633 A.2d 867 (quoting *McGee v. State,* 219 Md. 53, 58, 146 A.2d 194 (1959), in turn quoting *Adams v. State,* 200 Md. 133, 140, 88 A.2d 556 (1952)). However, despite Maryland's preference for "limited voir dire," *Dingle,* 361 Md. at 13, 759 A.2d 819, the trial court does not err when it opts to ask "[q]uestions not directed to a specific ground for disquali-

fication but which are speculative, inquisitorial, catechising or 'fishing,' asked in the aid of deciding on peremptory challenges." *Davis,* 333 Md. at 34–35, 633 A.2d 867 (quoting *McGee,* 219 Md. at 58–59, 146 A.2d 194).

 Thus, absent a clear abuse of discretion, an appellate court will not disturb a trial judge's decision to ask or not to ask a specific voir dire question. Our review of the voir dire process must be conducted on a case-by-case basis, accounting for the particular circumstances of each case. Rarely has an appellate court found abuses of discretion within the voir dire process. Judge Bell (now Chief Judge) cited six such instances when discussing this standard of review in his dissenting opinion in *Davis.*

[W]hen it is, or potentially is, in the case, the venire must be questioned as to possible racial bias, *Bowie v. State,* 324 Md. 1, 15, 595 A.2d 448 (1991), religious bias, *Casey* [*v. Roman Catholic Archbishop* ], 217 Md. [595] at 606–07, 143 A.2d [627] at 632 [ (1958) ], how the venire would weigh the credibility of a police officer's testimony versus that of the defendant or another witness, *Langley,* 281 Md. at 349, 378 A.2d at 1344, and juror attitudes concerning the death penalty, *Bowie,* 324 Md. at 5, 595 A.2d at 450. These are not the only circumstances, however, in which the failure of the trial court to further inquire may constitute an abuse of discretion. *See e.g., Alexander v. R.D. Grier & Sons Co. Inc,* 181 Md. 415, 419, 30 A.2d 757, 758 (1943). In that case, the trial court's refusal to ask "whether or not [jurors] or any of their immediate family [were assessables] in the Keystone Indemnity Exchange," where the issue was the enforcement of an assessment against a subscriber by Keystone, was held to be an abuse of discretion. This Court noted that the question was directed at determining whether any juror was biased or prejudiced: the juror's financial interest 'would theoretically incline him in favor of recovery of a verdict for the liquidator.' *Id.* at 419, 30 A.2d at 758. *See also Morford v. United States,* 339 U.S. 258, 70 S.Ct. 586, 94 L.Ed. 815 (1950) (where panel from which the jury was selected consisted of almost entirely government em-

ployees, refusal to allow questions pertaining to possible influence of the federal loyalty oath was error).

*Davis,* 333 Md. at 59–60, 633 A.2d 867 (Bell, J., dissenting).

Recently, in *Dingle,* the Court of Appeals again discussed the voir dire process. Chief Judge Bell, writing for the majority, explained:

> [T]here may be, and often is, a conflict between keeping the voir dire process limited and the goal of ferreting out cause for disqualification. This case presents a good example: the trial judge recognized the relevance of the questions, that they were designed to uncover prejudice that would, if not discovered, deny the petitioner a fair trial. Expediency and the perceived need to limit the process, however, led the court to find a way to avoid examination of each affected venire person as to the admittedly relevant matters and allow each such person to make his or her own call as to his or her qualification to serve.

*Dingle,* 361 Md. at 14, 759 A.2d 819. The Court recognized a trial judge's difficulty in ensuring an impartial jury while adhering to limited voir dire. The Court ruled, however, that when a trial court attempts to balance this conflict, its questions posed to the venire must "advanc[e] the purpose of voir dire," and not "distort[ ] and frustrate[ ] it." *Id.* at 21, 759 A.2d 819. Implicitly, the Court ruled that, when necessary, the trial judge's constitutional duty to empanel an impartial jury will trump our practice of limited voir dire.

The trial court in *Dingle* asked compound or "two-part" questions to the venire, such as, "Are any of you or your family members or close personal friends associated with members of any law-enforcement agency, . . . and if you are so associated, would that fact interfere with your ability to be fair and impartial if you were seated as a juror in this case?" *Id.* at 4, n. 4, 759 A.2d 819. The Court of Appeals emphasized that "the trial judge is the focal point" of the voir dire process, *id.* at 15, 759 A.2d 819, and that "[b]ias is a question of fact." *Id.* Compound voir dire questions erroneously shift the bias

fact-finding responsibility from the trial judge to the venire person. As the Court stated:

> When the venire person's attitudes are the subject of inquiry, and a dispute arises, that becomes a factual matter—ordinarily one involving credibility as to whether the venire person actually holds that attitude—which the court is required to resolve to the same extent as if the issue involved concrete factual matters such as associations and statuses. The court simply can not rely merely on what the venire person says. Moreover, the court is well equipped to make such factual determinations and, in fact, is required to do so.

*Id.* at 19, 759 A.2d 819.

Question No. 5, in the instant case, is similar to voir dire questions discussed in both *Davis* and *Dingle*. In *Davis*, where the credibility of a police officer was at issue, the trial judge refused to ask the venire questions concerning law enforcement employment or association. *Davis*, 333 Md. at 35, 633 A.2d 867. The Court ruled:

> In general, the professional, vocational, or social status of a prospective juror is not a dispositive factor establishing cause to disqualify. Rather, the proper focus is on the venire person's state of mind, and whether there is some bias, prejudice, or preconception. Short of those instances where there is a demonstrably strong correlation between the status in question and a mental state that gives rise to cause for disqualification, mere status or acquaintance is insufficient to establish cause for disqualification of a prospective juror. The fact that a prospective juror is employed as, related to, or associated with a law enforcement officer does not establish that the prospective juror has any undue bias or prejudice that will prevent that person from fairly and impartially determining the matter before them.

*Id.* at 37, 633 A.2d 867. The *Davis* Court held that a trial court does not err when it necessarily asks such a line of questioning, but there is no requirement to do so. *Id.* at 38, 633 A.2d 867.

In *Dingle,* the three-member dissenting opinion regarded the majority opinion as overruling *Davis* and, moreover, as a "departure from the long-standing tradition of a limited voir dire process," in part because the trial court in *Dingle* "was not required to ask a single one of the questions or subject areas proposed by Petitioner." *Dingle,* 361 Md. at 37, 759 A.2d 819 (Raker, J., dissenting). The dissenters essentially argued that it is inconsistent for an appellate court to find error in the form the question takes, when there is no error in not asking the question at all.

The majority, however, does not explicitly view *Dingle* as overruling *Davis.*[4] The *Dingle* dissenters correctly point out that the failure to ask questions aimed at uncovering law enforcement employment and associations was not an abuse of discretion in *Davis.* The *Dingle* majority, however, appears to hold that appellate review of voir dire questions not posed to the venire will not necessarily identify mandatory questions, but, instead, will recognize abuses of discretion only under specific circumstances. The majority in *Dingle* did not address the question of whether the trial court would have abused its discretion if the judge chose not to ask whether members of the venire were employed by or associated with law enforcement. This kind of "*Davis*-question" was not an issue before the *Dingle* Court. To the contrary, the majority in *Dingle* gave great deference to the trial judge's decision that, in that particular case, the "*Davis*-question" lay soundly within the discretionary boundaries of *reasonably* likely *to reveal cause for disqualification* and *fishing.* Once it was determined that the questions posed by the trial judge in *Dingle* were proper voir dire questions, the Court was obligated to address the inherent flaw within the compound form the trial court phrased those questions.

▇▇▇▇ Turning our attention to whether the trial court in the instant case abused its discretion by failing to ask Question

---

4. The majority opinion in *Dingle* overrules Judge McAuliffe's concurring opinion in *Davis.*

No. 5, we cannot simply turn to the holding in *Davis* and rule, as a matter of law, that there was no abuse of discretion here. We do not find an abuse of discretion on this issue because the facts of the instant case do not support such a conclusion.

First, Thomas insists his proposed voir dire question is distinguishable from the holding in *Davis* because he asked a compound question aimed directly at the potential bias created by a juror's relationship with a law enforcement official. However, that argument is in direct conflict with the *Dingle* prohibition of compound voir dire questions.

Even a narrow examination of only the substance of Question No. 5, however, fails to reveal an abuse of discretion. Significant to the determination of whether there has been an abuse of discretion is whether the proposed question was "more than adequately covered by the trial court's voir dire." *Miles v. State*, 88 Md.App. 360, 381, 594 A.2d 1208 (1991). The bias that a circuit court is tasked to keep from infecting jury deliberations must be "directly related to the crime, the witnesses, or the defendant." *Dingle*, 361 Md. at 10, 759 A.2d 819. Question No. 5 seeks to uncover a bias, either favorable or contrarily unfavorable, toward the law enforcement witnesses in Thomas's case. Addressing this concern, the circuit court asked the venire "whether they had any relationship or dealings with the prosecutor, defense attorney, or any of the police witnesses in the case." This question satisfactorily identified potential jurors that the court should have dismissed for cause due to a possible bias directly related toward a witness in Thomas's case.

Moreover, "where a principal part of the State's evidence is testimony of a police officer diametrically opposed to that of a defendant," *Langley*, 281 Md. at 349, 378 A.2d 1338, the trial court must ask whether any member of the venire would give "either more or less credence [merely] because of the occupation or category of the prospective witness." *Id.* (quoting *Brown v. United States*, 338 F.2d 543 (D.C.Cir.1964)). Here, the circuit court properly asked whether any member of the panel would be "inclined to give more or less weight to the

testimony of a police officer or other law enforcement officer than to the testimony of another witness simply because of that person's status as a police or law enforcement officer." In light of the voir dire questions asked, the circuit court did not abuse its discretion by denying Thomas's request to ask Question No. 5. Similar to *Davis*, the proposed question may have allowed Thomas to use his peremptory challenges more wisely, but would not have discovered any relevant bias, not previously established.

## B.

Question No. 10, which Thomas properly brought to the circuit court's attention, is, however, a question that the court should have asked. Under the Maryland Declaration of Rights Article XXI, "a defendant [has] the right to examine prospective jurors to determine whether any cause exists for a juror's disqualification." *Bedford v. State*, 317 Md. 659, 670, 566 A.2d 111 (1989). Question No. 10 aims directly at biases related to the defendant's alleged criminal act, which when uncovered, will disqualify a juror if the bias is so strong as to impair the juror's impartiality.

Preliminarily, we note that the current "two-part" form of Question No. 10 is unacceptable under the *Dingle* ruling. As the voir dire in the instant case took place before the Court of Appeals filed *Dingle* on September 15, 2000, we do not fault Thomas for proposing Question No. 10 as a two-part question. Further, we believe the issue of the trial judge's discretion is still properly before this Court. In accordance with *Dingle*, the circuit court must pose Question No. 10 to the venire through two questions. The first question should identify any jurors who harbor strong feelings about narcotics or the laws governing narcotics. Then, the trial court should individually ask those members of the venire who responded affirmatively follow-up questions regarding their ability to be fair and impartial despite their strong feelings.

Maryland disallows compound questions under *Dingle*, and it is equally improper to excuse for cause those members of

the venire who just answer affirmatively to the first question. In *King v. State*, 287 Md. 530, 414 A.2d 909 (1980), the trial court excused for cause two jurors who felt that possession of marijuana should not be a criminal act. The defense counsel in that case argued that neither of two prospective jurors suggested that they would ignore the law, and excusing them for cause was an abuse of discretion. The Court of Appeals held:

> In this case, the trial court excluded the entire class of prospective jurors who believed that the marijuana laws should be modified, irrespective of any other consideration peculiar to those jurors. The court stated that a juror who wanted the law concerning "simple possession" of marijuana changed "is not a competent juror." The court also ruled: "If someone doesn't believe that law as it now exists, they certainly are not qualified as jurors." By so deciding, the trial court excluded from the panel a significant part of the community. We hold that the trial court committed reversible error by excluding any juror who expressed a personal belief that the law concerning marijuana should be changed *without inquiring whether or not that belief would prevent the juror from fairly and impartially deciding the case in accordance with existing law in the evidence presented.*

*Id.* at 539, 414 A.2d 909 (emphasis added).

Plainly stated, observing that most citizens have a bias against proscribed criminal acts is not extraordinary. Yet, a bias that is so strong against a particular criminal act that it distorts a juror's ability to render a fair and impartial verdict must be uncovered. Question No. 10 was reasonably likely to identify jurors with strong feelings toward narcotics laws that could hinder their ability objectively to resolve the matter presented.

Such a bias may exist for any number of reasons, including, but not limited to, a juror's own struggle with substance abuse or a juror's friend or family member whose life had been negatively altered by the influence of drugs in our society. Furthermore, it is important to note that such bias does not

readily present itself to the court without the aid of properly phrased voir dire questions. As Thomas claims, "the sad truth is that the widespread use and sale of illicit drugs today affects individuals and families without regard to age, race, economic class, or geographical location."

Prospective jurors with strong feelings about drug laws are not uncommon. In *King*, the Court of Appeals commented that "[i]t is common knowledge that a significant segment of our society believes, as a matter of public policy, that the criminal laws relating to marijuana should be modified in one way or another." *King*, 287 Md. at 536, 414 A.2d 909. Literature in the field of drug policy often addresses controversial alternatives to the nation's current drug prohibition laws, such as legalization, decriminalization, and medicalization. *See* Mathea Falco, *Toward a More Effective Drug Policy*, 1994 U. Chi. Legal F. 9, 9; Eric E. Sterling, Symposium: *The Sentencing Controversy: Punishment and Policy in the War Against Drugs: The Sentencing Boomerang: Drug Prohibition Politics and Reform*, 40 Vill.L.Rev. 383, 384 (1995); Melody M. Heaps and Dr. James A. Swartz, *Toward a Rational Drug Policy: Setting New Priorites*, 1994 U. Chi. Legal F. 175; Tracey L. Meares, Symposium: *Rethinking Federal Criminal Law: Charting Race and Class Differences in Attitudes Toward Drug Legalization and Law Enforcement: Lessons For Federal Criminal Law*, 1 Buff.Crim. L.R. 137 (1997).

Despite efforts from the proponents of these alternative solutions, the "war on drugs" continues to be a household phrase, as well as the driving force behind federal, state, and local drug-law enforcement policy. Eric E. Sterling, President of the Criminal Justice Policy Foundation, identifies how this "war" can create biases that alter the impartial state of mind of a perspective juror. Sterling writes:

At the same time, the "drug war" label transformed those who used drugs—ostensibly those who were supposed to be helped by drug laws—into the enemy and then into a subhuman category of "the druggies" or "druggers." They ceased to be people with drug problems, chemical disorders,

or brain disease, and became the "bad guys," as the public's hatred of drugs grew into a hatred of druggies. For the Drug Enforcement Agency (DEA), and DEA personnel who train State and local police, this hatred translated into a variety of practices: druggies and their families could be rousted, humiliated, terrorized, jailed, hurt, threatened with being shot, or even, if necessary, shot.

Sterling, *supra* at 398–99.

There is evidence that voir dire questions, such as proposed Question No. 10, are effective in revealing strong feelings toward narcotics laws that may hinder a juror's ability to serve. Thomas points to the recent voir dire in *Jones v. State,* No. 2795, September Term 1999, a case still pending in our Court.[5] There, a Harford County jury panel was told that the defendant was charged with conspiring to sell crack cocaine and was asked, "Has any member of the jury panel, or any member of your immediate family, ever received treatment for or had a problem with drug addiction?" Of the ten jurors who responded, five were excused for cause after they told the trial judge that, because of their strong feelings against drugs, they would find it difficult to render a fair and an impartial verdict based on the evidence in the case. Similarly in *King,* the trial court excused two jurors because they believed the current laws prohibiting possession of marijuana should be changed. *King,* 287 Md. at 531, 414 A.2d 909.[6]

---

**5.** This Court may take judicial notice of its own records in other cases. *Fletcher v. Flournoy,* 198 Md. 53, 61, 81 A.2d 232 (1951); *Irby v. State,* 66 Md.App. 580, 586, 505 A.2d 552 (1986).

**6.** Just a few examples from other jurisdictions include: *U.S. v. Quiroz–Hernandez,* 48 F.3d 858, 869 (5th Cir.1995), where trial court questioned the venire as to "views about the controlled substances law," and a prospective juror stated her discomfort with the case because she was "against anybody that uses . . . drugs."; *U.S. v. Delval,* 600 F.2d 1098, 1103 (5th Cir.1979), trial judge questioned the prospective jurors at length regarding "their attitude toward the increased incidence of violations of the drug laws, and their feelings toward drugs in general," and in response a number of "jurors admitted some partiality and were excused."; *U.S. v. Burton,* 894 F.2d 188, 190 (6th Cir.1990), during voir dire, seven jurors opined that "the current drug laws are too lenient.";

 As we stated *supra,* there are only two mandatory topics to be covered during the voir dire process. However, there are no mandatory questions a trial judge must ask of the venire. In *Davis,* Judge Bell's dissenting opinion identified six "areas of inquiry where, if reasonably related to the case at hand, a trial judge must question prospective jurors." *Davis,* 333 Md. at 36, 633 A.2d 867. These six questions aimed at discovering either (1) racial bias, (2) religious bias, (3) an unwillingness to convict founded upon circumstantial evidence in a death penalty case, (4) an inclination to give greater weight to police testimony, (5) a financial interest in the outcome of the case, or (6) a government loyalty oath, have essentially become *defacto mandatory,* as an appellate court is certain to find similar abuses of discretion under similar circumstances. Judge Bell stated in *Davis* that "[t]hese areas entail potential biases or predispositions that prospective jurors may hold which, if present, would hinder their ability to objectively resolve the matter before them." *Id.* We find that the potential biases sought to be revealed by proposed voir dire Question No. 10 pose an obstacle to impaneling a fair and impartial jury, similar to the six questions cited by Judge Bell.

Justice (now Chief Justice) Rehnquist's opinion in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), is instructive in our current determination. The United States Supreme Court in *Wainwright* explained "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment." *Wainwright,* 469 U.S. at 424, 105 S.Ct. 844. The Court reaffirmed the standard expressed in *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), stating "[t]hat standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath.'" *Wainwright,* 469 U.S. at 424, 105 S.Ct. 844 (quoting *Adams,*

*Jack v. State,* 867 S.W.2d 942, 946 (Tex.Ct.App.1993), juror indicated that she had "some problems with selective enforcement of drug laws."

448 U.S. at 45, 100 S.Ct. 2521). This legal principle, which essentially excuses a potential juror from sitting on a capital jury if that juror is unable to carry out the law regardless of the facts presented, is wholly applicable to the instant case.

Laws regulating and prohibiting the use of controlled dangerous substances harbor an unusual position within our criminal code, such that jurors may be biased because of strong emotions relating to the dangers of narcotics and their negative effects upon our cities and neighborhoods, or, on the contrary, biases may exist because of passionate positions that advocate the decriminalization of narcotics. Moreover, unlike the clear disparity in favor of the prosecution created by "death-qualified" juries, jurors with strong feelings about drug laws are as equally inclined to hold biases against the State as they are against the defendant.[7]

No other question asked of the venire adequately covered the area of undue influence Thomas sought to discover with Question No. 10. The State directs our attention to the voir dire question asked by the circuit court:

> Is there any other reason why any member of this panel feels that if they are picked as a juror in this case they would not be a fair and impartial juror and decide this case based solely on the evidence in this case and the law as I would instruct you in this case?

We observe, however, the dissenting language of Judge Bell in *Davis*, stating:

> Merely asking general questions such as, "is there any reason why you could not render a fair and impartial verdict," is not an adequate substitute for properly framed questions designed to highlight specific areas where potential jurors may have biases that could hinder their ability to fairly and impartially decide the case.

*Davis*, 333 Md. at 47, 633 A.2d 867. Thomas presented a valid voir dire question reasonably likely to uncover a bias "*directly*

---

7. Contrast the voir dire process in the instant case with that of *King, supra.*

*related to the crime."* *Dingle,* 361 Md. at 10, 759 A.2d 819 (emphasis added). The circuit court abused its discretion in refusing to ask Thomas's proposed voir dire Question No. 10. Accordingly, we reverse.

## II. *The Identification*

█ Prior to trial, Thomas moved to suppress Det. Burgoon's identification of his photograph on the ground that it was procured by improper suggestiveness. In determining the admissibility of an extrajudicial identification, such as a photo array, the defense has the initial burden of showing "some unnecessary suggestiveness" in the procedures employed by the police. If the defense meets that burden, then the State must prove, by clear and convincing evidence, the existence of reliability in the identification that outweighs the corrupting effect of the suggestive procedure. *Loud v. State,* 63 Md.App. 702, 706, 493 A.2d 1092, (1985).

█ Thomas argues that the improper suggestiveness began when Det. Burgoon asked Murry who it was that he had just purchased drugs from and Murry said his name was "Jerrod," and later told him Thomas's last name. Furthermore, Thomas asserts the MVA check that produced a physical description matching that of the man from whom Det. Burgoon had purchased cocaine, and the fact that the MVA faxed him only one photograph, that of Thomas, was improperly suggestive. Thomas analogizes the instant case to *Rustin v. State,* 46 Md.App. 28, 415 A.2d 631 (1980), in which an officer who viewed a robber for five to ten seconds during a robbery arrested a suspect several hours later. Then, over the next few days, other police officers and citizens, including the victim, told him that he had arrested the wrong man, and that Rustin was the actual perpetrator. The officer looked into Rustin's record, was given a single photograph of Rustin, and went to interview him in prison, where he identified Rustin as the robber he witnessed for five to ten seconds. This Court reversed Rustin's conviction because the officer's identification was improperly suggestive.

While there are some similarities between *Rustin* and the instant case, such as the fact that Det. Burgoon first learned Thomas's name from a witness and used that information to find a photograph of him, there are significant differences. Most importantly, in his own testimony, Thomas admitted he was present at the Crown station that evening, but denied selling cocaine. He testified, instead, that he was at Carter's house when she received a telephone call from Murry. He accompanied Carter when she drove to the Crown station and left her car to make a telephone call when Det. Burgoon pulled up. When no one answered his phone call, he went into the Crown station store to buy cigarettes. When he came out of the store, Det. Burgoon and Murry were standing by the phone. Thomas returned to use the phone again and, as he walked up, he saw Murry hand Det. Burgoon a baggie and heard the detective ask, "How much do you want for it?" Murry replied, "225." Detective Burgoon handed Murry money, which Murry, in turn, passed to Thomas. Thomas believed Murry gave him the money because he owed a debt to Carter. Thomas testified that Murry was his cousin, and that Murry had called to tell Carter to meet him because he owed her money.

In rebuttal, Det. Burgoon contradicted Thomas's assertion that he had left the area of the pay phone and gone into the Crown store. He testified that Thomas stayed by the phone "until the deal was done," then returned to Carter's car.

In his testimony at trial, Thomas admitted that he was present at the crime scene, but denied that his participation was at the level described by Det. Burgoon. To the extent that Thomas's testimony does not negate the alleged impropriety of Det. Burgoon's identification of Thomas, another difference between *Rustin* and the instant case is that, in *Rustin,* the officer arrested a suspect based on his recollection of the robber's appearance, but extrinsic information, some of it supplied by other law enforcement officials, convinced him that he had made an incorrect identification. Here, Det. Burgoon spent time with Thomas and knew his appearance. All that was missing was his name. Unlike the officer in

*Rustin,* Det. Burgoon saw the photograph and immediately recognized it as that of the man who sold him cocaine. Although it may sometimes be better practice for law enforcement officers to view suspects in photographic arrays, here, Det. Burgoon's viewing of Thomas's single photograph was not improperly suggestive. This was not a case, like *Rustin,* where the police repeatedly said to the witness, "This is the man." *Rustin,* 46 Md.App. at 33, 415 A.2d 631.

Even though Thomas testified that he was present at the crime scene, he also raised, as he is permitted to do prior to trial in a motion to suppress identification, the additional argument that Burgoon's identification was unreliable. The State asks that we disregard that argument under *Brashear v. State,* 90 Md.App. 709, 603 A.2d 901 (1992), which held that the failure to argue a particular theory of suppression operates as a waiver of that argument on appeal. We note, however, that both the prosecutor and the trial court referred to the reliability of the identification, and, therefore, we find it necessary to address this contention.

The factors to be considered in evaluating the reliability of the identification include the witness's opportunity to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of any prior description, the witness's level of certainty, and the length of time between the crime and the identification. *Loud,* 63 Md.App. at 706, 493 A.2d 1092 (quoting *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)).

Considering these factors, we find that Det. Burgoon's identification of Thomas contained the hallmarks of reliability. Detective Burgoon testified that he and Thomas stood close together, within arm's length, for three or four minutes under bright lights. During this time, Det. Burgoon's entire attention was focused on Thomas. Although the police officer was frightened because this was his first undercover narcotics purchase, he testified that he had more than five years of experience in other divisions of the police force. And, despite the fact that Det. Burgoon's description of the man

who sold him cocaine was simple and undetailed, Det. Burgoon was not a lay witness describing a criminal to police; he was a police officer making a mental note of what he had seen during the commission of a crime. The delay of approximately six weeks between participating in the drug buy and viewing the photograph was not so long as to defeat reliability. We therefore find the photographic identification reliable.

### III. *Prior Convictions*

At trial, the State asked Thomas during cross-examination if he had twice been convicted of robbery and he replied that he had. There was no further reference to Thomas's convictions, either in testimony or in closing argument.

Evidence of a prior conviction is admissible to impeach the credibility of a witness if the crime was infamous or was otherwise relevant to credibility and the trial court determines that the probative value of admitting evidence of the crime outweighs the danger of unfair prejudice. Maryland Rule 5–609(a) (2001).[8]

Thomas acknowledges that robbery is an infamous crime and does not contest the discretion of the trial court to admit evidence of one of his convictions. He argues, however, that evidence of the *two* convictions was an abuse of discretion. We disagree. Nothing in the Rule limits the number of convictions by which a witness can be impeached. Thomas argued that the introduction of the second conviction was more prejudicial than probative because it might lead the jury to believe that appellant earned his living as a robber and would convict him due to a history of criminal activity.

While Thomas is justified to believe that two convictions can lead jurors to believe him less credible than another defendant with only one conviction, the record in the instant case does not suggest an unwarranted conclusion. Two convictions have more weight than one and can permit the jury to

---

8. The Rule imposes other conditions, such as a 15–year time limit, none of which were involved in this case.

conclude that a testifying witness twice convicted is less credible than a testifying witness that has only one conviction.

In *Jackson v. State*, 340 Md. 705, 711, 668 A.2d 8 (1995), the Court of Appeals rejected a "rigid approach to the use of prior convictions," and followed "the trend towards increasing flexibility that has marked the historical development of Rule 5–609." *Id.* This flexibility and lack of rigidity grants great deference to the discretion of the trial judge. Assuming the crime is infamous or relevant to the witness's credibility, and less than fifteen years old, the trial court may, in its discretion, admit the convictions to impeach the witness if it finds the probative value of the evidence outweighs the danger of unfair prejudice. In the instant case, the trial court did not abuse its discretion in weighing the potential for prejudice and deciding to admit both convictions for the purpose of impeachment.

**JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR HOWARD COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY HOWARD COUNTY.**