*Anthony Bean v. State of Maryland*,
No. 601, Sept. Term 2017
Opinion by Leahy, J.

**Motion to Suppress Out-of-Court Identification > Due Process > State Action**

To ameliorate the risk of an incorrect identification, criminal defendants may invoke the Due Process Clause of the Fourteenth Amendment to combat "the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures." *Webster v. State*, 299 Md. 581, 599-600 (1984) (quoting *Moore v Illinois*, 434 U.S. 220, 227 (1977)). A criminal defendant must first demonstrate, however, that the identification was orchestrated or engineered by the actions of "law enforcement officers[.]" *Perry v. New Hampshire*, 565 U.S. 228, 238-39 (2012).

**Motion to Suppress Out-of-Court Identification > Due Process > State Action**

Courts engage in "[t]he due process check for reliability" *only* if the defendant demonstrates "improper police conduct" in the form of "law enforcement officers us[ing] an identification procedure that is both suggestive and unnecessary." *Perry v. New Hampshire*, 565 U.S. 228, 238-39, 241 (2012). Otherwise, the reliability of the witness's identification is a question for the jury, leaving the defendant with the typical protections against unreliable evidence: the right to persuade the jury of the evidence's lacking reliability through the cross-examination of witnesses, general rules governing the admissibility of evidence, and jury instructions on "the fallibility of eye-witness identification." *Id.* at 233, 237.

**Motion to Suppress Out-of-Court Identification > Due Process > State Action**

With no evidence that police *arranged* for a victim to view an extremely suggestive flyer containing the defendant's photo, the Due Process Clause of the Fourteenth Amendment to the United States Constitution is not implicated. *See Perry v. New Hampshire*, 565 U.S. 228, 241 (2012).

**Motion to Suppress Out-of-Court Identification > Due Process > State Action**

Once a victim has already volunteered an out-of-court identification of the defendant based on her independent viewing of a suggestive Be On the Lookout flyer, it was not improper or unreasonable for police to use that flyer to confirm her identification. *Cf. State v. Greene*, ___ Md. App. ___, ___, No. 2199, September Term, 2018, slip op. at 3-15 (filed Jan. 31, 2019).

Circuit Court for Baltimore City
Case No. 116144037

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 601

September Term, 2017

_____

ANTHONY BEAN

v.

STATE OF MARYLAND

_____

Wright,
Leahy,
Raker, Irma S.,
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Leahy, J.

_____

Filed: March 28, 2019



Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.

Suzanne C. Johnson, Clerk

Appellant, Anthony Bean, moved to suppress the pre-trial identification in this case because, he argued, it resulted from an impermissibly suggestive procedure and was unreliable in violation of his right to due process of law guaranteed by the Fourteenth Amendment to the United States Constitution. The Supreme Court has declared that the "primary evil" that impermissibly suggestive identifications procedures generate is the "very substantial likelihood of misidentification." *Neil v. Biggers*, 409 U.S. 188, 198 (1972). To invoke the protections of the Due Process Clause of the United States Constitution, however, a criminal defendant must first demonstrate that the eyewitness identification was "procured under unnecessarily suggestive circumstances *arranged by law enforcement.*" *Perry v. New Hampshire*, 565 U.S. 228, 248 (2012) (emphasis added). Failure to show state action—that the police arranged the pre-trial identification— effectively ends the constitutional inquiry. *Id.* at 232-33.

Following an armed robbery and carjacking, the Baltimore City Police Department created an internal "be on the lookout" flyer ("BOLO") that showed images of the assailants and the missing vehicle, and stated the particulars of the crime. The BOLO was released on social media and seen by the victim's brother, who showed it to the victim, who then recognized her assailants on the BOLO. The victim informed the police that she had seen the BOLO and that she recognized her assailants on the flyer. The next morning, at the police station, police showed her the BOLO again to confirm her identification and then showed her a single photo of each assailant, including one of Bean. She confirmed for police that Bean was one of her attackers.

The suppression court denied the motion, finding that the release of the BOLO

constituted state action, and that the identification procedures were impermissibly suggestive. Nevertheless, after applying the *Biggers* reliability analysis, the Court found that the victim's identification was reliable and admissible into evidence. Bean was subsequently tried and convicted by a jury in the Circuit Court for Baltimore City. He noted a timely appeal, challenging the court's denial of the motion to suppress.

We hold that, although the BOLO was impermissibly suggestive, the Baltimore City Police Department did not arrange the victim's identification of Bean and, therefore, there was no state action. Absent "improper law enforcement activity," the Due Process Clause and its check on the reliability of witness identifications were not implicated in this case. *Perry* 565 U.S. at 238-39. We conclude, although on different grounds relied upon by the circuit court, that it was correct to deny Bean's motion to suppress.

## BACKGROUND

### A. The Motion to Suppress

On March 16, 2017, Bean moved to suppress the pretrial photo identification. The following facts are derived from the suppression hearing.

### 1. The Robbery and Initial Police Involvement[1]

Ms. Perry testified that at around 10:00 p.m. on March 22, 2016, she parked her vehicle in the 1700 block of Johnson Street in Baltimore City and began walking toward her home. She said, "[it was] kind of dark out" but that there was "[a] little" street lighting.

---

[1] Ms. Perry's testimony at the suppression hearing describing her assailants was, of course, given *after* she viewed the BOLO and made the identification based on the single photo at the police station.

2

After walking about "50 feet or so" from her car, she observed three men, roughly 100 feet away, walking directly toward her. One of the men, who was wearing a hooded sweatshirt, "kind of, held back, [] I guess, like [a] lookout," about five feet away, while two other men, "both African-American gentlemen, about average height," approached her to effectuate the robbery. She believed that the lookout person, who was wearing a hooded sweatshirt, was a male because "he seemed tall, built bigger than, you know, a girl." When pressed, "are you certain it wasn't two males and a female," she responded that "it seemed to me like three males."

She explained that one of the men who approached her—the "main" robber—"got closer to me, probably about two feet [away]." She stated that "he seemed taller, bulkier, kind of chubby around mid-face. And he had a black hoodie on[.] . . . He, kind of, had, like, a shaved face a little bit." Ms. Perry noted that the other person who approached her was "average height [and] skinny[,]" but she was unable to provide other details because this person was wearing a mask and did not speak during the robbery.

During the robbery, the "main" robber demanded to know where her car was and threatened that he would "blow [her] brains out" if she did not cooperate. She pointed the assailants in the direction of her car, surrendered her "keys, and [] just, kind of, handed over everything." After handing over her belongings, a car "came down the road," which caused the assailants to "scatter[,]" giving Ms. Perry a chance to run to her house and call the police. She recalled that the entire interaction lasted "[p]robably about a couple minutes, two or three minutes." When asked about her state of mind at the time, Ms. Perry testified that she was "[t]errified. Scared for [her] life."

Officer Pennington from the Baltimore Police Department arrived at Ms. Perry's home 15-20 minutes after the robbery. At some point after Officer Pennington arrived, Ms. Perry exited her home and discovered that her vehicle had been stolen. She testified that she provided Officer Pennington with some initial details about the men who had robbed her, and then he escorted her to the police station where she spoke with a detective about the robbery.[2] That night, Ms. Perry canceled her credit cards by phone, and a representative informed her that her card had just been used at a local 7-Eleven.

## 2. The Police Flyer

The next morning, Detective William Bailey called Ms. Perry to obtain further details about the robbery. Ms. Perry told Det. Bailey that her credit card had been used at a nearby 7-Eleven. Det. Bailey and two other detectives went to the 7-Eleven and recovered the stolen credit card that was left there, along with a receipt detailing the transaction. Using the date and time of the transaction, Det. Bailey obtained the store's surveillance footage from the time of the purchase. The video showed two black males enter the store with a black female, then stand behind the female as she made a purchase with a credit card. Det. Bailey pulled still-frames of the three individuals shown in the video and created the BOLO to aid in identification of the suspects from the robbery. He also included two pictures of a red 2015 Toyota Rav4—the same color, make, and model of Ms. Perry's vehicle—and the instruction at the bottom in bold, underlined, red, and

---

[2] During the suppression hearing, no testimony was elicited about what details Ms. Perry shared with Officer Pennington or what she told the unnamed detective at the police station on the night of the robbery.

4

capitalized font "**FOR OFFICAL USE ONLY / LAW ENFORCEMENT SENSITIVE**." In addition to his contact information, Det. Bailey included the following paragraph on the BOLO, just below the still-frame photos:

> "In reference to an armed carjacking that took place in the 1700 Blk Johnson St on 3/22/16 @ 10:20pm, where a red 2015 Toyota Rav4 was taken, vehicle has raven & oriole sticker on the rear. This detective is attempting to identify the above individuals. Approach with caution, the individuals operating this vehicle should be considered armed and dangerous."

Det. Bailey sent the BOLO to all the other police department districts in Baltimore in the hope that other precincts could "possibly locate the car or maybe [identify] the individuals from prior contact." Det. Bailey testified that when he created the BOLO, he intended it to remain internal. Unbeknownst to Det. Bailey, the public relations office of the Baltimore City Police Department uploaded the BOLO onto several social media platforms later that day, including Facebook.[3] Det. Bailey testified that he had no influence, even as the lead investigator, over the decision to place the BOLO on social media.

Ms. Perry testified that later that afternoon, her brother told her that he had seen a police flyer on Facebook concerning a robbery and carjacking that occurred the previous night. Ms. Perry recalled:

> "My brother actually sent me something that he had saw [sic] on Facebook. Detective Bailey had, I think, put out, you know, a whatever, for – because the car was missing, and it was, like, a missing – 'We're looking for these people.' And the people that came up on the ad with my vehicle, they – three pictures were taken in the 7-Eleven, and I recognized the one gentleman."

---

[3] Facebook is a social-media website on which "users create online profiles to share information about themselves with other Facebook users." *Sublet v. State*, 442 Md. 632, 637 n.5 (2015) (citing Joshua Briones & Ana Tagvoryan, Social Media as Evidence 1:5:1:1 (2013)).

5

She testified further that the person she recognized was wearing "a black-hooded sweatshirt."

Shortly after 5:00 p.m. on March 23, 2016, police located Ms. Perry's vehicle. Det. Bailey called Ms. Perry to report that they had located her vehicle and were sending it to the crime lab for additional analysis. To his surprise, Ms. Perry said that she had seen the BOLO on social media and recognized one of the men as one of the robbers. Det. Bailey arranged for Ms. Perry to come to the police station the next day for an interview.

### 3. The Interview

Before Ms. Perry's interview, officers patrolling the Cherry Hill area of Baltimore City stopped a woman wearing the same dress as the woman who used Ms. Perry's credit card in the 7-Eleven surveillance video. When questioned, the woman identified the two men with her in the surveillance footage, one of whom was Bean. Later that morning, Ms. Perry arrived at the Southern District police station. During the suppression hearing, defense counsel asked Det. Bailey what procedures he used during Ms. Perry's interview, and he responded:

> ". . . I had [Ms. Perry] come in. I couldn't show her a photo array at that point, because she already had [seen the BOLO] through social media. So I used the BOLO we had, attempt to identify, had her look at that and sign off where the two individuals that she said she saw that night rob her."

Det. Bailey indicated that Ms. Perry "signed both pictures" on the BOLO to indicate that she recognized both men from the night of the robbery. After she had identified both assailants in the BOLO, Det. Bailey showed Ms. Perry the MVA photos of the two men she had identified in the BOLO. Det. Bailey explained why he then showed Ms. Perry a

6

single photo of Bean rather than a full six-photo array:

> "After she already told us she looked at the BOLO, we already knew she saw the faces. And [] then I thought at that point i[t] would be a moot point to show a photo array that she already [knew] the people's faces already. Now, I did show her individual photos of both of them. She wrote a statement out for each one, what particular – what part they played in the robbery."

Ms. Perry testified to her recollection of the events at the police station. Before being presented with any of the photos at the suppression hearing, Ms. Perry said that when she was shown the BOLO at the police station, she pointed out who she recognized from the robbery. Ms. Perry said that when she first saw the BOLO on Facebook, she was "[i]nstantly" able to identify both men—Bean as the "main" robber, Walker as the "lookout," but was unable to identify the woman.

The State showed Ms. Perry Bean's MVA photo that she had viewed at the police station. She stated that when she viewed Bean's photo, she wrote a statement on the picture describing his role in the robbery and how she recognized him. The court permitted Ms. Perry to read her statement at the suppression hearing and she recited the following:

> "I recognize this man who robbed me at gunpoint. He pointed a gun at me and demanded I show them where my car was. He stated he would blow my brains out if I didn't show them where my car was. I recognize [him] based on his stockier, full face, darker complexion, dark eyes, and full lips. He also had a shaved head with fine black hair. I also recognize this man from the social media ad on the police flyer."

Ms. Perry admitted that she wrote this description "after viewing the photos."

Following Ms. Perry's testimony, defense counsel argued for the suppression of the pretrial identification, maintaining that the procedure was impermissibly suggestive and the underlying identification was not reliable. Defense counsel argued that the timing of

7

the release and subsequent exposure to the BOLO was problematic because Ms. Perry

viewed it before she ever made an identification of Bean. Counsel pressed:

> "If you look at just the layout of the [BOLO] itself, it's got a big picture of
> her car. It's got a description of not that we're looking for these folks that
> were in the 7-Eleven on Hanover Street on the 23rd, we're looking for these
> folks that robbed this lady and took this car. And it suggests very plainly that
> these are the people that we think did it."

Counsel continued, noting that before Ms. Perry saw "the single photograph at the precinct

. . . the way [the BOLO] was put together and the information that's contained in it []

definitely suggested the answer to her." Counsel insisted that regardless how she came

into contact with the BOLO, its release constituted state action because it "was generated

by the police department, and it was disseminated by them[.]" Defense counsel reiterated

that the message relayed to viewers of the BOLO was inherently suggestive and noted that

the BOLO "gives a really strong statement, and it's a statement by the police. This is a

police government-generated document[.]" Finally, defense counsel argued that the

identification lacked independent reliability.

### 4. The Court's Ruling

The suppression court denied Bean's motion to suppress the pre-trial identification.

First, however, the court found that the release of the BOLO constituted state action:

> "[T]he [BOLO] is, in fact, a bulletin that was prepared by the Baltimore City
> Police Department, specifically references the date and time of the incident,
> that they were looking for these individuals in relating [sic] to a car jacking,
> and that that car jacking place [sic] at the 1700 block Johnson Street, and that
> these individuals were armed and dangerous and should not be approached."

> "Even though that did pass to a neighborhood association and maybe through
> Facebook, ultimately, to the alleged eyewitness in this case, the Court does
> find that, that state action, as that it did originate and was created by the

8

Baltimore City Police Department[.]"

Next, the court found that the procedure used was impermissibly suggestive, and stated the following:

> ". . . I don't think there's any doubt, and the State has conceded that the [BOLO] itself is suggestive.[4]  The Police Department is basically saying, 'This is the individual, or these are the individuals that we believe were responsible for this.'"

> "So the Court does find that [Bean] has met [his] burden to establish that the pretrial identification at issue here was impermissibly suggestive when it was provided to Ms. Perry."

Finally, the court considered the reliability of the identification, and found that the factors enumerated in *Biggers*, 409 U.S. at 198, weighed in favor of reliability, and denied motion to suppress.

## 5.  Trial

This case proceeded to trial from March 16-20, 2017.  On the morning of the third day of trial, Bean made a motion for judgment of acquittal, arguing that besides Ms. Perry's pretrial identification, there was no other evidence linking Bean to the crime.  Defense counsel pressed:

> ". . . [T]here is no other corroborating evidence.  It's not like, well, maybe she's mistaken, and – but you can look at the fact that his fingerprints were in the car or there was property recovered, or there's an association between he and Mr. [Daikon] Walker.  There's none of that in this case.  The case hinges on her identification.  So I think that considering that the Court ought to issue a judgment of acquittal on all counts."

The court denied Bean's motion for judgment of acquittal.

---

[4] During the State's argument, it conceded that "there is some suggestiveness in what [Ms. Perry] saw once she was presented this BOLO."

The jury found Bean guilty of all crimes stemming from the armed carjacking and theft of Ms. Perry's belongings. The court then sentenced Bean to 15 years of incarceration.

Bean timely appealed to this Court, presenting the following question for our review:

> "Whether the trial court erred in denying Anthony Bean's motion to suppress the complainant's extrajudicial identification where the complainant viewed an internal police flyer containing details about the crime prior to meeting with police and then made a photographic identification based solely on that same police flyer and a single photograph of Mr. Bean?"

We will include additional facts as they pertain to the discussion below.

## DISCUSSION

## I.

## Standard of Review

We limit our review of the denial of a motion to suppress to the record of the suppression hearing. *James v. State*, 191 Md. App. 233, 251 (2010). The suppression court's factual findings and witness credibility determinations will not be disturbed absent clear error, and we view all the evidence, as well as inferences that can be reasonably drawn therefrom, in a light most favorable to the State. *McFarlin v. State*, 409 Md. 391, 403 (2009). Issues of law—specifically whether a constitutional right has been violated—receive no deference. *State v. Andrews*, 227 Md. App. 350, 371 (2016) (citing *Williams v. State*, 372 Md. 386, 401 (2002)) (additional citation omitted). Therefore, we review the suppression court's findings of fact for clear error and its ultimate decision *de novo*.

10

## II.

## Due Process

The ability of law enforcement to ascertain reliable pre-trial identifications from witnesses is a vital part of the American criminal justice system. A criminal defendant's ability to defend against the admission of identifications that are unreliable and obtained through impermissibly suggestive means, however, is equally important. To guard against the risk of an incorrect identification, criminal defendants may invoke the Due Process Clause of the Fourteenth Amendment to combat "the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures." *Webster v. State*, 299 Md. 581, 599-600 (1984) (quoting *Moore v. Illinois*, 434 U.S. 220, 227 (1977)). A criminal defendant must first demonstrate, however, that the identification was orchestrated or engineered by the actions of "law enforcement officers[.]" *Perry*, 565 U.S. at 238-39.

Once a defendant successfully demonstrates that the identification procedure involved actions by law enforcement officials, Maryland suppression courts undertake a two-step inquiry to determine whether to suppress an extra-judicial identification. *Smiley v. State*, 442 Md. 168, 180 (2015). First, the defendant bears the burden of demonstrating "some unnecessary suggestiveness in the procedures employed by police." *(Charles) Thomas v. State*, 213 Md. App. 388, 417 (2013) (internal quotations omitted). The inquiry ends here if the procedure is not impermissibly suggestive. *Id; Smiley*, 442 Md. at 168. If the procedure is impermissibly suggestive, then the inquiry proceeds to the second step wherein the burden shifts to the State to "prove, by clear and convincing evidence, that the

11

independent reliability in the identification outweighs the 'corrupting effect of the suggestive procedure.'" *Gatewood v. State*, 158 Md. App. 458, 475 (2004) (quoting *(Jerrod) Thomas v. State*, 139 Md. App. 188, 208 (2001), *aff'd*, 369 Md. 202 (2002)). To apprise the reliability of an identification, the Supreme Court fashioned a five-factor test in *Biggers*. 409 U.S. at 199-200. Only if the State cannot prove that the identification is independently reliable will the court suppress a suggestive pretrial extrajudicial identification. *Conyers v. State*, 115 Md. App. 114, 121 (1997).

But we engage in "[t]he due process check for reliability" *only* if the defendant demonstrates "improper police conduct" in the form of "law enforcement officers us[ing] an identification procedure that is both suggestive and unnecessary." *Perry*, 565 U.S. at 238-39, 241. Otherwise, the reliability of the witness's identification is a question for the jury, leaving the defendant with the typical protections against unreliable evidence: the right to persuade the jury of the evidence's lacking reliability through the cross-examination of witnesses, general rules governing the admissibility of evidence, and jury instructions on "the fallibility of eye-witness identification." *Id.* at 233, 237. Our analysis in this case begins with the threshold determination of whether law enforcement arranged Ms. Perry's identification of Bean.

### State Action

The State maintains that because law enforcement did not specifically facilitate Ms. Perry's initial viewing of the BOLO, her identification of Bean did not constitute state action geared specifically towards obtaining an identification. Consequently, the State argues, the suppression court erred in conducting a due-process inquiry. Bean, for his part,

12

argues that there was state action because "Ms. Perry viewed the impermissibl[y] suggestive BOLO that was released by the Baltimore City Police Department" before she made a "formal identification," and Det. Bailey then "reinforced the initial prejudice" by showing Ms. Perry the BOLO at the station before finally showing her a single MVA photo of Bean.

The Supreme Court in *Perry* underscored the principle that the Due Process Clause protected against suggestive identifications only when law enforcement *arranged* the circumstances of the witness's identification. *Id.* at 232. In rejecting Perry's arguments to the contrary, the Court acknowledged the likelihood that witnesses' out-of-court identifications would result from suggestive circumstances not arranged by law enforcement: "For example, suppose a witness identifies the defendant to police officers after seeing a photograph of the defendant in the press captioned 'theft suspect,' or hearing a radio report implicating the defendant in the crime." *Id.* at 244.

Since *Perry*, courts nationwide have confronted suggestive circumstances that lack the requisite state action and have ruled that the witness's identification did not implicate the Due Process Clause. For instance, the Supreme Judicial Court of Maine held that there "was no improper state conduct" when a witness identified the defendant out of court after the jail released a picture of the defendant (at that point, only a suspect) to a news outlet but "took no other actions with regard to the witness's out-of-court identification." *State v. Davis*, 191 A.3d 1147, 1154 (Me. 2018). Similarly, the Supreme Court of Arizona ruled that "although police disseminated [a defendant's] composite sketch and photo to the media," state action was lacking because "there [wa]s no evidence that police attempted to

13

influence any of the[] witnesses' pretrial identifications, for example, *by arranging for or encouraging victims to view the media coverage*." *State v. Goudeau*, 372 P.3d 945, 980 (Ariz. 2016) (citations omitted). *See also United States v. Elliot*, 732 F.3d 1307, 1309-10 (11th Cir. 2013) (holding that a witness's independent viewing of the defendant's photos on the internet and surveillance footage of the robbery at the store where the robbery occurred prior to the lineup was not the result of police misconduct); *Young v. State*, 374 P.3d 395, 411 (Alaska 2016) ("Because there was no state action involved in [the witness's] identification of Young from a picture on the television news, due process did not require that the superior court screen it for reliability under *Brathwaite*."); *State v. Gilmore*, 156 So. 3d 46, 52-53 (La. Ct. App. 2013) (holding that there was no "suggestive pre-trial procedure arranged by police" when the witness saw the defendant's photos on a local news website before she viewed the photographs in a police lineup), *writ denied sub nom. State ex rel. Gilmore v. State*, 119 So. 3d 600 (La. 2013); *In re Johnny H.*, 111 A.D.3d 576, 576 (N.Y. App. Div. 2013) ("We find no basis for suppression in the fact that there may have been a civilian-arranged single-photo identification, made prior to the police procedure and without any police involvement."); *State v. Martin*, 505 S.W.3d 492, 502-03 (Tenn. 2016) (holding that a victim viewing the defendant's booking photograph on the County's "Who's In Jail?" website did not involve improper state conduct, even when police later included the same photo in an array shown to the victim); *Gilmore v. State*, 397 S.W.3d 226, 238-39 (Tex. App. 2012) (declining to address reliability, in part, because there "[wa]s no evidence that law enforcement officials arranged for [the witnesses] to watch the news to see a photograph of Appellant").

These cases make clear that courts will not conclude that "improper police conduct" influenced a witness's out-of-court identification when police merely release a photograph of the defendant to the media as part of an on-going investigation. That police in this case released Bean's photograph on social media[5] rather than a legacy media outlet is a distinction without a difference as it relates to the propriety of the state action. The release of the BOLO on social media in this case was not "improper police conduct" that triggers a *Biggers* analysis because police did not "arrange or encourage" Ms. Perry to view the BOLO, *see Goudeau*, 372 P.3d at 980; nor was there any evidence that the police directed the BOLO toward Ms. Perry in any sort of targeted manner. *Cf. O'Connell v. State*, 742 N.E.2d 943, 948 (Ind. 2001) ("One can imagine an orchestrated prompting of a witness by means of the media."). In fact, Det. Bailey, the lead investigator in this case, testified that he was surprised that Ms. Perry saw the BOLO and volunteered that she had identified the men it depicted. Moreover, to the extent the identification was arranged, it was arranged by Perry's brother, not the police department. With no evidence that police *arranged* for Ms. Perry to view the BOLO, which was extremely suggestive, the Due Process Clause is not implicated. *See Perry*, 565 U.S. at 241.

Det. Bailey's use of the BOLO to confirm Ms. Perry's identification at the police station does not alter this result. Once Ms. Perry had already volunteered an out-of-court identification of Bean based on her independent viewing of the BOLO, it was not improper or unreasonable for Det. Bailey to confirm her identification. *Com. v. Currier*, 455 N.E.2d

---

[5] For purposes of assessing state action in this case, it makes no difference whether Det. Bailey or the public relations department released the BOLO on Facebook.

15

158, 158 (Mass. App. Ct. 1983) ("[W]here it has been established 'that the initial identification is the product of something other than improper action by the State, due process does not require the suppression of it *or its repetitions*." (emphasis added)). *Cf. State v. Greene*, ___ Md. App. ___, ___, No. 2199, September Term, 2018, slip op. at 3-15 (filed Jan. 31, 2019) (explaining that the due-process requirements for reliable identifications are not implicated when police conduct a "confirmatory identification" as opposed to a "selective identification").

The Supreme Court of Rhode Island reached a similar result last year in *State v. Alves*, 183 A.3d 539 (R.I. 2018). In that case, a witness printed out the defendant's photograph from the internet and brought it to the police station. *Id.* at 541. Police had the witness circle the defendant on the printed image and later showed him a single photo of the defendant to confirm his prior identification. *Id.* The Court reasoned that this "was not so much an identification procedure as it was a confirmation of the identification that [the witness] had already made[,]" and, therefore, was not unnecessarily suggestive "nor did it implicate defendant's right to due process." *Id.* at 543. *See also State v. Darveaux*, 318 N.W.2d 44, 47 (Minn. 1982) (holding that a "physical lineup was merely confirmatory" and, therefore, "did not cause a substantial likelihood of misidentification" because the witnesses "had already positively identified defendant in a valid photographic display"); *State v. Liverman*, 727 S.E.2d 422, 424, 427-28 (S.C. 2012) (holding that a show-up identification procedure, which would have "normally [been] considered unduly suggestive," was "merely confirmatory" because the witness had already identified the defendant for the police prior to the show-up); *Martin*, 505 S.W.3d at 502-03 (Tenn. 2016)

16

(holding that it was not improper for the police to include in a photo array the same booking photograph that the victim had viewed previously on the County's "Who's In Jail?" website); *State v. Aponte*, 391 P.3d 327, 330-31 (Utah Ct. App. 2016) (rejecting the defendant's argument that it was improper for police to show a photograph of the defendant to a witness "only for the limited purpose of confirming the accuracy of an identification already made by someone who should have known the [defendant's] identity").

In conclusion, we cannot say the Baltimore City Police Department arranged Ms. Perry's identification of Bean. Absent "improper law enforcement activity," the Due Process Clause and its check on the reliability of witness identifications were not implicated in this case. The circuit court was correct to deny Bean's motion to suppress Ms. Perry's identification.

**JUDGMENT FOR THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. APPELLANT TO PAY COSTS.**