**State v. Greene, No. 2199 of the 2018 Term, Opinion by Moylan J.**

FIRST-DEGREE MURDER – THE CHARGE – THE STATE APPEAL – A SUPPRESSION MOTION BASED ON IDENTIFICATION LAW – THE WRONG PEW IN THE WRONG CHURCH – THERE WAS NO SELECTIVE PROCESS IN PLAY – THE RELIABILITY FACTORS ARE TOTALLY INAPPLICABLE – "I THINK SO" VERSUS "I KNOW SO" – "I THINK SO": GOOD, RELEVANT EVIDENCE – COACHING A WITNESS – A CONFIRMATORY IDENTIFICATION – PRIMARY CONCLUSION – CONSTITUTIONAL IDENTIFICATION LAW: THE FIRST HALF-DECADE – THE SPOTLIGHT TURNS TO GENERAL RELIABILITY: THE SECOND HALF-DECADE – THE <u>ARGUENDO</u> ALTERNATIVE – THE EXCLUSIONARY VERSUS THE BALANCING APPROACH – A RELIABILITY ANALYSIS WAS ESSENTIALLY IGNORED – AN ERRONEOUS OR A CLEARLY ERRONEOUS HYPOTHETICAL FINDING – EXCLUDING THE IN-COURT IDENTIFICATION AS WELL AS THE PRE-TRIAL IDENTIFICATION – CONCLUSION

Circuit Court for Baltimore City
Case No. 117362037

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2199

September Term, 2018

_____

STATE OF MARYLAND

v.

DANIEL JOSEPH GREENE

_____

Meredith,
Nazarian,
Moylan, Charles E., Jr.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.

_____

Filed: January 31, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

A flurry of intense Supreme Court activity in the decade from June of 1967 through June of 1977 produced a weighty body of criminal-constitutional law that has generally been referred to simply as "identification law." The thrust of this opinion is that, notwithstanding that impressive body of constitutional doctrine, every time that the word "identification" is used in a case or an issue involving identification somehow arises in a case is not necessarily the occasion to invoke constitutional identification law. The mere word "identification" need not set off the constitutional fire bell. Just as there have been, since 1967, numerous constitutional issues involving identification law, there always have been and will continue to be numerous non-constitutional issues that may, coincidentally, involve the subject of identification. As will be more fully discussed <u>infra</u>, there may be, for instance, a constitutional chasm of difference between what we will call selective identification issues and other merely confirmatory identification issues. We need to look at identification issues more closely before invoking the constitution.

### The Charge

The appellee, Daniel Joseph Greene, was indicted on December 28, 2017, in the Circuit Court for Baltimore City, for the first-degree murder of Jon Hickey. The appellee moved pre-trial to suppress both an out-of-court and an in-court identification of him by Jennifer McKay as the man depicted in a surveillance video tape. Following a hearing on August 20, 2018, the suppression hearing judge granted the appellee's motion. Appropriately, the State filed an appeal.

### The State Appeal

The State filed its appeal on August 20, 2018. The appeal is authorized by Maryland Code, Courts and Judicial Proceedings Article, Section 12–302(c)(4). Pertinent are subsections (c)(4)(iii) and (iv):

> (iii) Before taking the appeal, the State shall certify to the court that the appeal is not taken for purposes of delay and that the evidence excluded or the property required to be returned is substantial proof of a material fact in the proceeding. <u>The appeal shall be heard and the decision rendered within 120 days of the time that the record on appeal is filed in the appellate court</u>. Otherwise, the decision of the trial court shall be final.
>
> (iv) Except in a homicide case, if the State appeals on the basis of this paragraph, and if on final appeal the decision of the trial court is affirmed, the charges against the defendant shall be dismissed in the case from which the appeal was taken. In that case, the State may not prosecute the defendant on those specific charges or on any other related charges arising out of the same incident.

(Emphasis supplied).

The record was filed with this Court on October 23, 2018. Accordingly, our decision must be rendered no later than February 20, 2019. We heard oral argument on January 7, 2019.

### A Suppression Motion
### Based On Identification Law

As part of an omnibus ten-pronged pre-trial motion pursuant to Maryland Rule of Procedure 4–252, the appellee moved for the suppression of both an out-of-court identification and an in-court identification of the appellee. The grounds asserted were that the identifying witness, Jennifer McKay, had been subjected to impermissibly suggestive procedures pursuant to <u>Stovall v. Denno</u>, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199

2

(1967), and its progeny in the course of the identification procedure. Sections 5 and 6 of the omnibus motion claimed:

> 5. That any identification of the Defendant made at a pre-trial identification procedure be suppressed <u>as having been obtained by an impermissibly suggestive process</u>, and in violation otherwise, of this Defendant's Constitutional or other legal rights.

> 6. That the in-court identification of this Defendant be suppressed as the product of a <u>pre-trial identification process which was impermissibly suggestive</u>, or which otherwise violates the Constitutional and other legal rights of the Defendant.

(Emphasis supplied).

After the appellee chose constitutional identification law as the suppression hearing battleground, everyone else followed suit. There were, to be sure, enough surface similarities to familiar identification law to make that an easy mindset into which to fall. The challenge based on identification law was the sole focus of the suppression ruling and that is the only issue brought before us on this State appeal.

### The Wrong Pew In The Wrong Church

Although we have elected to consider, purely <u>arguendo</u>, constitutional identification law as an alternative holding, our basic feeling is that this case is, quite to the contrary, not a case involving familiar constitutional identification law at all.

The facts are unusual. The victim, Jon Hickey, was murdered in his Fells Point apartment in the early morning hours of November 29, 2017. Several days after the murder, the police recovered a surveillance video from the house next door to Jon Hickey's apartment. It apparently showed a figure attempting to enter the Hickey apartment. The police believed that that unknown figure may have been the murderer.

Accordingly, Jennifer McKay was asked to come to the police station to see if she could identify the figure on the video cam recording. She readily assented. As of the time of the murder, Jennifer McKay had been involved in an intimate romantic relationship with Jon Hickey for several months. Prior to that, Jennifer McKay had been involved in an intimate relationship with the appellee for five years. She and the appellee, moreover, had known each other well since childhood. A strong theory as to murderous motive was the appellee's jealousy at having been replaced by Jon Hickey.

At the police station, Jennifer McKay was shown the relatively brief footage recorded by the video cam. It was not in evidence. The police interview with Jennifer McKay, however, was recorded and later transcribed. It was the police behavior during that interview that was the exclusive focus of the suppression hearing.

### There Was No Selective Process In Play

Over the decades, it has been recognized that the very purpose of constitutional identification law has been to guarantee the reliability of the selection process. Whenever a witness is asked to select the wrongdoer from a line-up of suspects, to select a photograph of the wrongdoer from a photographic array, or otherwise to select the wrongdoer from a larger group, the law's concern is that the selection process be untainted by the police slipping the answer, by word or by more subtle behavior, to the witness.

In this case, by contrast, there was no selection process in play. Jennifer McKay was not asked to look at three separate video cam tapes and to select the one with the appellee in it. Jennifer McKay was asked simply to confirm, if she could, that the man on the surveillance tape was the appellee, Daniel Greene. Jennifer McKay's knowledge of the

4

appellee's appearance was absolute, beyond any peradventure of a doubt. All that Jennifer McKay was asked to do could as readily have been asked of the appellee's mother or of his best friend or of his probation officer.

The difficult question in this case involved not Jennifer McKay's ability to identify the appellee but rather the quality of the picture or tape she was being asked to review. Was it a good picture or was it an essentially unrecognizable picture? How far away was the subject from the camera? Was the scene well-lit or dark? Did the subject ever turn and look at the camera? Did the camera have any adverse impact on color? She was not looking at high school yearbook photos but at possibly blurred and ambiguous images.

### The Reliability Factors Are Totally Inapplicable

Since Simmons v. United States, 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968), impermissible suggestiveness is nothing more than a threshold question. The primary concern is with ultimate reliability. Our focus is now on the reliability factors articulated by Neil v. Biggers, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), and Manson v. Brathwaite, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). In the present day, almost the entire attention of constitutional identification law is on these reliability factors. In the case before us, however, those reliability factors are utterly irrelevant. Classic identification law is simply inapplicable. How then do we apply the heart of identification law if the heart of identification law is irrelevant?

### "I Think So" Versus "I Know So"

If this case is not about identification law, what then is it about? A fair reading of the suppression hearing transcript and a fair reading of the transcript of the police interview

of Jennifer McKay reveal clearly that what really concerned the appellee and defense counsel and the suppression hearing judge was a discernible effort by the police to coach the witness. Any suggestiveness, however, concerned not whom Jennifer McKay would select. There was no selective identification. It concerned how forcefully or persuasively Jennifer McKay would testify. The police wanted to prime her to be a more effective witness.

The police interview of Jennifer McKay was fundamentally friendly and amicable at all times. The exchanges were relaxed and pleasant. Jennifer McKay, moreover, was not ultimately affected by any police suggestiveness. She identified the appellee as the man on the video cam tape at the very outset of her interview. She identified him in almost precisely the same terms at the very end of the interview. In response to the very first police question, Jennifer McKay responded:

> DET. O'CONNOR: Does he look like anybody?
>
> MS. MCKAY: It looks like Dan.
>
> DET. O'CONNOR: Why does it look like Dan?
>
> MS. MCKAY: The beard.
>
> DET. O'CONNOR: Anything else?
>
> MS. MCKAY: The build.
>
> DET. O'CONNOR: Okay.

(Emphasis supplied).

There was obvious difficulty with the quality of the tape, particularly with the effect that "night vision" had on color.

6

DET. O'CONNOR: Take a look at them.

MS. MCKAY: <u>It kind of looks like him.</u>

DET. VAUGHN: Just remember the night vision is there.

DET. O'CONNOR: So, the colors are the things you're looking at aren't really the same.

MS. MCKAY: What they are, right, right. <u>So what color would that jacket be?</u>

DET. O'CONNOR: <u>I don't know.</u>

MS. MCKAY: Okay.

(Emphasis supplied).

At another point, another detective showed her a photographic array.

DET. VODERK: All right. Do you recognize anyone?

MS. MCKAY: Yes.

DET. VODERK: <u>What number was the person you recognized?</u>

MS. MCKAY: <u>Number four I believe.</u> The top one.

DET. VODERK: Okay. <u>Who is that person?</u>

MS. MCKAY: <u>Daniel Greene.</u>

DET. VODERK: Okay. And <u>how do you know Daniel Greene?</u>

MS. MCKAY: <u>He's my ex-boyfriend.</u>

(Emphasis supplied).

The pictures she viewed convinced Jennifer McKay that the appellee had killed Jon Hickey.

DET. O'CONNOR: . . . . [W]hat do you think happened to Jon?

7

MS. MCKAY: Someone killed him.

DET. O'CONNOR: <u>Someone?</u>

MS. MCKAY: <u>Dan did.</u>

DET. O'CONNOR: Why do you say that?

MS. MCKAY: <u>Pictures.</u>

(Emphasis supplied).

At the end of the interview, her position was unchanged.

DET. VAUGHN: When you look at those pictures, <u>I know you said that it looks like Dan. Is that Dan on those pictures?</u>

MS. MCKAY: (<u>Affirmative nod</u>).

DET. VAUGHN: You're shaking your head.

MS. MCKAY: Yeah.

(Emphasis supplied).

Any problem the police had was exclusively with Jennifer McKay's degree of certainty. Her answers were consistently and invariably "I think so" rather than the prosecutorial desideratum "I know so." At one point she explained that her answer meant that it "looks more like him than it doesn't look like him."

MS. MCKAY: <u>It looks very much like him.</u> But I mean, I can see small differences. Like that, the face frame. But (inaudible) <u>looks more like him than it doesn't look like him.</u>

DET. O'CONNOR: Okay.

(Emphasis supplied). She is not being uncertain about Daniel Greene. What was uncertain was the quality of the surveillance footage.

When the police tried to urge her to be more sure, Jennifer McKay remained adamant that "this looks like him."

> DET. O'CONNOR: But you need to -- <u>we need to know if that's him or not.</u> And then we can do our own follow ups from there. But --

> MS. MCKAY: I mean, from these pictures, yes, <u>I would say this looks like him.</u>

(Emphasis supplied).

When the police explained that "I think" or "I don't know" is not the response they want, Jennifer McKay would not budge.

> DET. O'CONNOR: That's one thing, <u>we just can't have the "I think" or "I don't know."</u> That is what it is right there in front of you.

> MS. MCKAY: Right.

> DET. O'CONNOR: And nobody's telling you to say one way or the other.

> MS. MCKAY: Right.

> DET. O'CONNOR: <u>We just need to know.</u>

> MS. MCKAY: No, <u>it looks like him</u>.

(Emphasis supplied).

In terms of her modest or relative level of certainty, Jennifer McKay did not yield to police suggestiveness but maintained her position consistently. Once again, however, any equivocation was based, almost certainly, on the poor quality of the video cam tape.

### "I Think So":
### Good, Relevant Evidence

Maryland Rule 5–401 provides:

9

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Maryland Rule 5–402 then provides:

Except as otherwise provided by constitutions, statutes, or these rules, or by decisional law not inconsistent with these rules, all relevant evidence is admissible. Evidence that is not relevant is not admissible.

Thus, "I think that is Dan Greene" is just as relevant as "I know that is Dan Greene." Not as weighty, but just as relevant. Certainly weightier than "I have no idea." "I think so" will take a close case to the jury, whereas "I have no idea" will not. See Fenner v. State, 381 Md. 1, 846 A.2d 1020 (2004). What is the percentage of certainty, moreover, that permits a witness to graduate from "I think" to "I know"? Is that percentage higher for scientists and academics than it is among laymen? Is it higher for timid souls than it is for more assertive types? Is Albert Einstein's "I think so" less weighty than a blowhard's "I know so"? One inevitably thinks of British historian and philosopher Thomas Babington Macaulay, who was referred to by fellow historian George Trevelyan, "I wish I could be as certain about anything as Tom Macaulay is about everything." Assertiveness may be as much about personality as it is about actual certainty.

## Coaching A Witness

Improperly or excessively coaching a witness could be, of course, with respect to any subject. The problem of coaching a witness is not one associated with identification law particularly. One could as readily be coached about testifying with greater certainty as to how much money was actually taken from the cash register or how provocative the threatening gesture actually was before one struck in self-defense.

In the last analysis, any police behavior found to have been offending in this case unquestionably would have been the effort to encourage or cajole Jennifer McKay to testify with a greater degree of certainty. Offensive as that effort may have been, moreover, it had no apparent effect. All of which is to say, this is not a classic selective identification case.

**A Confirmatory Identification**

The problem is that of recognizing those sets of circumstances where suggestiveness is simply not a pertinent factor. The preceding concatenation of distinguishing circumstances would be a lot easier to handle if we had the benefit of a convenient shorthand reference or tag. The New York Court of Appeals has supplied that need to a fare-thee-well with the term "confirmatory identification." Distinguishing the selective identification from the confirmatory identification, it makes, for present purposes, the invaluable point that all identifications do not implicate the same juridical baggage.

People v. Rodriguez, 79 N.Y.2d 445, 593 N.E.2d 268 (1992), was a case in which the suspect and the identifying witness were, as in the case at hand, well acquainted with each other. In such cases, suggestiveness is not a concern.

> "In cases in which the defendant's identity is not in issue, or those in which the protagonists are known to one another, 'suggestiveness' is not a concern and, hence, [CPL 710.30] does not come into play."

593 N.E.2d at 271 (emphasis in original; citations omitted). The degree of closeness of the prior relationship is the controlling factor.

> [W]hether the exception applies depends on the extent of the prior relationship, which is necessarily a question of degree.

593 N.E.2d at 271.

The New York Court of Appeals fully explained the rationale of the "confirmatory identification" exception.

> A court's invocation of the "confirmatory identification" exception is thus tantamount to a conclusion that, <u>as a matter of law, the witness is so familiar with the defendant that there is "little or no risk" that police suggestion could lead to a misidentification.</u> . . . . In effect, it is a ruling that <u>however suggestive or unfair the identification procedure might be, there is virtually no possibility that the witness could misidentify the defendant.</u>

> <u>The exception may be confidently applied where the protagonists are family members, friends or acquaintances or have lived together for a time.</u>

593 N.E.2d at 272 (emphasis supplied; citations omitted).

In <u>People v. Tas</u>, 51 N.Y.2d 915, 415 N.E.2d 967 (1980), the New York Court of Appeals applied the exception in a case where the suspect and the identifying witness had been fellow inmates in the same tier of cells for at least one month.

> As the Appellate Division noted, the victim and the defendants were inmates in the same tier of cells for a period prior to the attack of at least one month and, although the victim may not have known their particular names, he was familiar with the defendants as individuals. <u>Since the participants in the incident the victim and the perpetrators were known to each other, there was no "identification" within the meaning of CPL 710.30</u> and no prior notice need have been given by the People.

415 N.E.2d at 967–68 (emphasis supplied; citations omitted).

In <u>People v. Collins</u>, 60 N.Y.2d 214, 456 N.E.2d 1188 (1983), the New York Court of Appeals was dealing with a voice identification. The controlling constitutional law is precisely the same as with visual identifications. The "confirmatory identification" exception applies with equal certainty.

> <u>When a crime has been committed by a family member, former friend or long-time acquaintance of a witness there is little or no risk that comments</u>

12

by the police, however suggestive, will lead the witness to identify the wrong person.

456 N.E.2d at 1191 (emphasis supplied).

The witness was being used in the <u>Collins</u> case for the same purpose as was the witness in the case now before us. The Court of Appeals observed:

> The existing identification procedures were designed for cases involving "eyewitnesses" or persons who actually witnessed the crime as a victim or bystander (see, e.g., <u>United States v. Wade, supra</u>, 388 U.S. pp. 228–229, 87 S. Ct. at pp. 1932–1933) and may be unsuitable in other contexts. <u>In the case now before us</u>, for instance, <u>Ruby Cohen's identification was sought not because she had witnessed the criminal events but because she knew the defendant.</u> There was no occasion to hold a "lineup" of tapes including persons other than the defendant simulating the crime. <u>The purpose of asking her to make an identification was not to see whether she could select the "real crime" but to determine whether</u>, when confronted with a recording of the crime, <u>she was able to identify the perpetrator as a person with whom she was familiar.</u>

456 N.E.2d at 1191 (emphasis supplied).

In <u>People v. Jenkins</u>, 230 A.D.2d 806, 646 N.Y.S.2d 535 (1996), the New York Appellate Division held that the use of a single photograph, albeit otherwise suggestive, had no such adverse effect in circumstances where the suspect and the identifying witness had established familiarity with each other.

> It is well settled that <u>the identification of a defendant by the use of a single photograph must be merely confirmatory, based on the eyewitnesses' prior familiarity with the defendant, in order to overcome the suggestiveness of the procedure employed.</u> The record here reveals that both identifying witnesses had sufficient familiarity with the defendant from having encountered him in the neighborhood two or three times a week for the period of a year. In addition, the eyewitness to the shooting also knew the defendant from an altercation on the streets in Brooklyn. <u>Under the facts presented, the identification of the defendant was merely confirmatory, and suppression was properly denied.</u>

13

230 A.D.2d at 807 (emphasis supplied; citations omitted).

In 2014, Massachusetts joined New York in recognizing, in <u>Commonwealth v. Crayton</u>, 470 Mass. 228, 21 N.E.3d 157 (2014), that the integrity of the selective process is not even called into question in circumstances involving a confirmatory identification rather than a selective identification.

> <u>See People v. Rodriguez</u>, 79 N.Y.2d 445, 449–450 & n. *, 583 N.Y.S.2d 814, 593 N.E.2d 268 (1992) (<u>"confirmatory identification" exception</u> to requirement of pretrial hearing on admissibility of suggestive pretrial identification <u>applies</u> where eyewitness and defendant are "known to one another" or where defendant's identity is not live issue at trial). And in both of these circumstances, where the witness is not identifying the defendant based solely on his or her memory of witnessing the defendant at the time of the crime, <u>there is little risk of misidentification arising from the in-court showup despite its suggestiveness.</u>

21 N.E.3d at 170 (emphasis supplied).

By 2018 New Jersey had also come aboard, at least by dicta if not by a square holding. In <u>State v. Pressley</u>, 232 N.J. 587, 181 A.3d 1017 (2018), the Supreme Court of New Jersey dealt with a case that did not involve a "confirmatory" identification. The "confirmatory" identification, however, was expressly recognized even as it was distinguished.

> Nor do we believe that this case involved <u>a "confirmatory" identification, which is not considered suggestive. A confirmatory identification occurs when a witness identifies someone he or she knows from before</u> but cannot identify by name. " . . . Police will, on occasion, display a single photograph to a witness in an effort to confirm the identity of a perpetrator. Police typically limit this method to situations in which the perpetrator is previously known to or acquainted with the witness."

181 A.3d at 1020 (emphasis supplied; citation omitted).

14

This more incisive analysis recognizes that a mere "confirmatory identification" does not generate the myriad risks of misidentification that frequently attend a selective identification made under suggestive circumstances. Accordingly, there is no necessity to conduct a taint hearing in order to decontaminate an identification procedure that is not presumptively tainted.

## Primary Conclusion

Our primary conclusion is that what was involved in this case was a mere confirmatory identification, and not a selective identification. Under these circumstances, the constitutional law governing identification procedures did not apply. There might have been some problem with the manner in which the police coached the identifying witness to assert herself with a greater degree of certainty, but no such contention is before us.

Because of the interest shown by all parties, however, in classic constitutional identification law, we will, purely arguendo, assume that it applies. We will now look at the present case through that very different lens.

## Constitutional Identification Law:
## The First Half-Decade

The appellee's attempt to cast the current controversy as one involving constitutional due process directs our analytic focus back to the turbulent decade between 1967 and 1977. In Wood v. State, 196 Md. App. 146, 7 A.3d 1115 (2010), cert. denied, 418 Md. 192, 13 A.3d 800 (2011), this Court described that ten-year-long phenomenon and its impact.

> Constitutional identification law . . . enjoyed a precise decade (plus four days) of high-profile celebrity between 1967 and 1977. During that

15

decade, it rivaled confession law and search and seizure law in the national spotlight. It commanded the attention of academic seminars and law reviews. It began with a sunburst on June 12, 1967, as the Wade–Gilbert–Stovall trilogy rocketed onto the national stage.

196 Md. App. at 157 (emphasis supplied).

Looking back from the perspective of over 40 years, it is now clear that that turbulent decade broke down into two very distinct half-decades. The first half-decade was obsessed with the Sixth Amendment's right to the assistance of counsel. The second half-decade shifted its attention almost completely onto general reliability pursuant to the Due Process Clause of the Fourteenth Amendment. The Sixth Amendment phase, moreover, relied heavily on the exclusion of evidence as a matter of law by suppression hearing judges. The general reliability phase, by contrast, relied heavily on the weighing of evidence as a matter of fact by lay jurors. It almost entirely eschewed the exclusion of the identification as a matter of law. In Conyers v. State, 115 Md. App. 114, 691 A.2d 802, cert. denied, 346 Md. 371, 697 A.2d 111 (1997), this Court noted the rising of the curtain.

> The decade began with a roar with the much heralded Wade–Gilbert–Stovall trilogy—United States v. Wade, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 87 S. Ct. 1951, 18 L. Ed. 2d 1178 (1967); and Stovall v. Denno, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967). Identification procedures, which had theretofore been treated as a purely factual matter left largely for lay jurors to handle, for the first time took on constitutional dimensions. The catalyst for the constitutionalization of identification procedures was the determination that a police lineup was deemed to be a "critical stage," thereby entitling an accused who was forced to stand in a lineup to the Sixth Amendment right to the assistance of counsel.

115 Md. App. at 116 (emphasis supplied).

16

Wood v. State noted both the Sixth Amendment character of those prototypical cases and the inevitable reliance on the exclusionary rule as a curative measure.

> The constitutional principle which they championed was the Sixth Amendment's guarantee of the assistance of counsel to a defendant. For the first time in constitutional history, the placing of a suspect in a police line-up for identification purposes was deemed to be a "critical stage." These are classic Sixth Amendment code words. If a defendant were placed in such a line-up without a lawyer having been provided and present, exclusion of the identification was automatically called for. Such exclusion was in high vogue, and everyone was talking about identification procedures.

196 Md. App. at 157 (emphasis supplied).

Creative law enforcement, however, soon found a way to outflank the Sixth Amendment by avoiding its application via two separate maneuvers. Wood v. State pointed out the Sixth Amendment's vulnerability to such creative prosecutorial strategy.

> Within five years, however, a Thermidorean Reaction set in. Kirby v. Illinois, 406 U.S. 682, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972), first held that a suspect placed in a pre-indictment, as opposed to a post-indictment, line-up did not yet enjoy the protection of the Sixth Amendment because such a suspect was not yet an "accused." Being at a critical stage would qualify an "accused" for Sixth Amendment assistance, but if you are not yet "accused" even a critical stage would not help. Whatever little wind still propelled the exclusionary sails after Kirby, it was largely wafted away by the subsequent holding in United States v. Ash, 413 U.S. 300, 93 S. Ct. 2568, 37 L. Ed. 2d 619 (1973), that even a post-indictment exhibition of a photograph of a subject, either in a group picture or as part of an array of individual photographs, was, unlike standing the suspect in a live line-up, not a critical stage. Whereas Kirby had diminished the ranks of the "accused," Ash diminished the incidence of a "critical stage."

196 Md. App. at 157–58 (emphasis supplied).

The prosecutorial strategy was clear-cut.

> In short order, the police adjusted their identification procedures so as to avoid almost entirely any Sixth Amendment problems. They either 1) used some identification modality, such as a photographic array, that was not a

17

critical stage, instead of a live police lineup or 2) made sure that a police lineup was used only for a suspect who was not yet an "accused."

Conyers v. State, 115 Md. App. at 117 (emphasis supplied).

Turner v. State, 184 Md. App. 175, 964 A.2d 695 (2009), then pronounced the requiem.

Under the combined impact of Kirby and Ash, the post-indictment line-up essentially disappeared from the world of criminal investigation, and with it any significant exclusion of identification evidence based on the Sixth Amendment's right to counsel. The once familiar line-up parade of stage and screen has been retired to the Smithsonian. Creative law enforcement procedures effectively finessed the Sixth Amendment.

184 Md. App. at 179 (emphasis supplied).

### The Spotlight Turns To General Reliability: The Second Half-Decade

With the essential fading away of identification issues based upon the Sixth Amendment right to counsel, attention inevitably turned to general due process. With that shift, moreover, came a concomitant shift away from the exclusion of evidence as a matter of law and toward the weighing of evidence as a matter of fact.

Whatever vitality the Wade–Gilbert–Stovall trilogy still retained after 1973 was by virtue of its third member, Stovall v. Denno, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967). Unlike Wade and Gilbert, Stovall was grounded in the due process clause of the Fourteenth Amendment rather than in the right to counsel of the Sixth Amendment. In one sense, a due process claim under Stovall enjoyed much broader coverage than a right to counsel claim under Wade and Gilbert because a due process claim is not limited to post-indictment procedures and does not require that the procedure be considered a critical stage. On the other hand, whereas a Sixth Amendment violation results in virtually automatic exclusion of the identification, a due process violation only occasionally does so. Instead of exclusion, an arguable due process violation generally calls for a balancing of competing factors under a "totality of circumstances" approach, and this is, far more often than

18

> not, a weighing function for a jury rather than an exclusionary function for a judge.

Turner v. State, 184 Md. App. at 179 (emphasis supplied).

In Stovall v. Denno, the third in the original trilogy of identification cases and the one based on general due process, the defendant was found guilty of both first-degree murder and attempted first-degree murder by the out-of-court identification, followed by an in-court identification, of a victim who had watched the defendant stab her husband to death and had then been stabbed herself a total of eleven times by the defendant. She underwent major surgery to save her life. On the day after the surgery, she was lying in her hospital bed when five detectives, one of whom was handcuffed to the defendant, brought the defendant into the room and stood him at the foot of the bed. The victim identified him: "That's the man."

Was such an identification procedure suggestive? Of course it was. As Turner v. State noted, "By its very nature . . . a one-on-one show-up is suggestive, just as 99 out of every 100 judicial or in-court identifications are suggestive. (It is always a good bet that the person the witness is being asked to identify is the guy sitting at the trial table who is not dressed like a lawyer.)." 184 Md. App. at 180.

The Supreme Court nonetheless affirmed the legitimacy of the one-on-one show-up in the hospital room on the ground that it, albeit unquestionably suggestive, was necessary and, therefore, not impermissible. A jury, the Supreme Court pointed out, is perfectly capable of weighing the pluses and minuses of such an identification. That is why mere suggestiveness in and of itself does not call for exclusion. Justice Brennan's opinion

pointed out that it is not a due process violation per se. It must be not only suggestive, but also impermissibly suggestive. Many self-evidently suggestive one-on-one show-ups shortly after a crime has occurred are deemed to be permissibly suggestive, and therefore unoffending, because of the exigent need to take quick action before the trail goes cold. Even as a starter, a challengeable identification procedure must be not only suggestive, but

**IMPERMISSIBLY SUGGESTIVE**.

With Stovall v. Denno, however, the definition of a challengeable identification procedure was still far from complete. Law enforcement was still awaiting the ultimate clarification. In Wood v. State, this Court described the fulfillment of that expectation.

> In 1968, Simmons v. United States, 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968), came riding, like the cavalry of old, to the rescue of beleaguered police identification procedures. Simmons fine-tuned the due process test of Stovall v. Denno. Even impermissible suggestiveness on the part of the police would not, ipso facto, call for suppression as a matter of law. Simmons made it clear that evidence of an identification will not be excluded unless the identification procedure was "so impermissibly suggestive as to give rise to **A VERY SUBSTANTIAL LIKELIHOOD OF IRREPARABLE MISIDENTIFICATION**."

196 Md. App. at 159–60 (emphasis in original).

Justice Harlan's opinion in Simmons v. United States was perspicaciously clear that the constitutional focus was not on police or prosecutorial behavior per se but only upon the ultimate reliability of the identification.

> [C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

20

390 U.S. at 384 (emphasis supplied). That is strong language. It is not merely a "likelihood" but "a very substantial likelihood" of not merely a "misidentification" but of "irreparable misidentification." With so austere a definition limiting the actual exclusion of an identification, it is small wonder that the Supreme Court has excluded an impermissibly suggestive identification on only a single occasion.

Simmons v. United States was transformative in constitutional identification law. What had been fundamentally exclusionary pursuant to the right to counsel of the Sixth Amendment became almost entirely non-exclusionary pursuant to the totality of the circumstances of the Due Process Clause. This will become a crucial factor when we turn to our alternative arguendo analysis infra.

Foster v. California, 394 U.S. 440, 89 S. Ct. 1127, 22 L. Ed. 2d 402 (1969), was decided just one year after Simmons v. United States and the two cases represent the Yin and Yang of ultimate reliability. After two successive line-ups and one individual show-up, all of which were highly suggestive, the Supreme Court concluded, "The suggestive elements in this identification procedure made it all but inevitable that [the witness] would identify petitioner whether or not he was in fact 'the man.'" 394 U.S. at 443. The procedure was held to have violated due process as a matter of law. Actually, Foster's being placed in a line-up without benefit of counsel would have been a violation of the Sixth Amendment right to counsel per United States v. Wade but for the fact that the line-up in Foster took place before the Wade opinion had been filed and Wade was held not to be retroactive. As late as 2012, Justice Sotomayor's dissenting opinion in Perry v. New Hampshire, 565 U.S.

228, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012), pointed out, "To date, <u>Foster</u> is the only case in which we have found a due process violation." 565 U.S. at 261.

The use of an exclusionary rule as a sanction against improper police or prosecutorial behavior, moreover, has little place in such a scheme, where the primary focus is on the quality of the evidence and not on the behavior of the police. <u>Turner v. State</u> was emphatic in that regard.

> With <u>Simmons</u> the focus turned to the ultimate reliability of the identification in question. If the identification is reliable, it, by definition, is not a misidentification. <u>Under the due process clause</u>, moreover, <u>the law does not use an exclusionary sanction to regulate police procedures. The focus is on the evidence itself in terms of its ultimate reliability.</u> If the evidence is reliable notwithstanding improper antecedent procedures, it will not be suppressed under the due process clause. <u>What matters is the trustworthiness of the evidence, not the propriety of the governmental conduct that produced it.</u>

184 Md. App. at 181 (emphasis supplied).

All that remained was to receive guidance from the Supreme Court with respect to assessing ultimate reliability. In <u>Neil v. Biggers</u>, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), on federal habeas corpus review, a United States District Court held that the station-house identification procedure had been so suggestive that it violated due process. The United States Court of Appeals for the Sixth Circuit affirmed that ruling. 448 F.2d 91 (1971). The Supreme Court reversed the Sixth Circuit and articulated a number of factors that could be used to assess the ultimate reliability of an identification without regard to impermissive suggestiveness.

> As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the

accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. Applying these factors, we disagree with the District Court's conclusion.

409 U.S. at 199–200.

Manson v. Brathwaite, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977), closed out the decade of heavy Supreme Court activity in this area. The identification procedure in question was found to have been impermissibly suggestive and the identification was suppressed by the United States Court of Appeals for the Second Circuit. 527 F.2d 363 (1975). Justice Blackmun's opinion noted that "[s]ince the decision in Biggers, the Courts of Appeals appear to have developed at least two approaches to such evidence." 432 U.S. at 110. The Supreme Court then contrasted the exclusionary approach to identification issues, as used by the Second Circuit in that case, with the "more lenient approach" focusing on ultimate reliability. It described the exclusionary approach:

> The first, or per se approach, employed by the Second Circuit in the present case, focuses on the procedures employed and requires exclusion of the out-of-court identification evidence, without regard to reliability, whenever it has been obtained through unnecessarily suggested confrontation procedures.

432 U.S. at 110 (emphasis supplied; footnote omitted). See also Pulaski, "Neil v. Biggers: The Supreme Court Dismantles the Wade Trilogy's Due Process Protection," 26 Stan. L. Rev. 1097 (1974).

The Supreme Court criticized the exclusionary approach for denying the jury evidence that is "reliable and relevant."

> The per se rule, however, goes too far since its application automatically and peremptorily, and without consideration of alleviating factors, keeps evidence from the jury that is reliable and relevant.

23

432 U.S. at 112 (emphasis supplied). The Court further pointed out how <u>per se</u> exclusion

can sometimes amount to a "Draconian sanction."

> The third factor is the effect on the administration of justice. <u>Here the per se approach suffers serious drawbacks.</u> Since it denies the trier reliable evidence, <u>it may result, on occasion, in the guilty going free.</u> Also, <u>because of its rigidity, the per se approach may make error by the trial judge more likely than the totality approach.</u> And in those cases in which the admission of identification evidence is error under <u>the per se approach</u> but not under the totality approach cases in which the identification is reliable despite an unnecessarily suggestive identification procedure reversal <u>is a Draconian sanction.</u>

432 U.S. at 112–13 (emphasis supplied; footnote omitted).

The Court then contrasted that approach with "the more lenient approach."

> <u>The second, or more lenient, approach</u> is one that continues to rely on the totality of the circumstances. It <u>permits the admission of the confrontation evidence if, despite the suggestive aspect, the out-of-court identification possesses certain features of reliability.</u> Its adherents feel that the per se approach is not mandated by the Due Process Clause of the Fourteenth Amendment. <u>This second approach</u>, in contrast to the other, is ad hoc and <u>serves to limit the societal costs imposed by a sanction that excludes relevant evidence from consideration and evaluation by the trier of fact.</u>

432 U.S. at 110 (emphasis supplied; citations omitted).

The Supreme Court first pointed out that it had recently been evidencing an

increasing disenchantment with the exclusionary approach.

> Certainly, <u>inflexible rules of exclusion</u> that may frustrate rather than promote justice <u>have not been viewed recently by this Court with unlimited enthusiasm.</u>

432 U.S. at 113 (emphasis supplied).

After a thorough and extended review of the opposing approaches, the Supreme

Court opted for ultimate reliability instead of for exclusion.

24

We therefore conclude that <u>reliability is the linchpin in determining the admissibility of identification testimony</u> for both pre- and post-Stovall confrontations. The factors to be considered are set out in <u>Biggers</u>. 409 U.S. at 199–200, 93 S. Ct. at 382. These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. <u>Against these factors is to be weighed the corrupting effect of the suggestive identification itself.</u>

432 U.S. at 114 (emphasis supplied).

This then was the lay of the land as of June 16, 1977, with respect to the constitutional propriety of selective identification procedures. That lay of the land has not changed since <u>Manson v. Brathwaite</u>.[1] All the identification law we need can be found in the decade 1967–1977.

## The <u>Arguendo</u> Alternative

Let us assume, therefore, solely for the sake of argument, that the pre-trial suppression hearing in this case were a procedure within the coverage of constitutional identification law, to wit, that we were dealing with a selective identification instead of a

---

[1] In the immediate wake of <u>Manson v. Brathwaite</u>, <u>Moore v. Illinois</u>, 434 U.S. 220, 98 S. Ct. 458, 54 L. Ed. 2d 424 (1977), held simply that placing an "accused" suspect in a position for a corporeal identification of him to be made was a violation of his Sixth Amendment right to counsel. <u>Watkins v. Sowders</u>, 449 U.S. 341, 101 S. Ct. 654, 66 L. Ed. 2d 549 (1981), held that, in the absence of any defense request for a hearing, there is no <u>sua sponte</u> constitutional obligation on the trial judge to conduct a hearing simply because there is identification evidence of questionable reliability.

The most recent entry in the identification law field is <u>Perry v. New Hampshire</u>, 565 U.S. 228, 261, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012). The Supreme Court held that a hearing on reliability is not required simply because an identification may be of questionable reliability. There must be some state action behind impermissible suggestiveness to trigger a taint hearing. Otherwise, it is simply for the jury to weigh and balance the evidence.

very different confirmatory identification. Even under such hypothetical circumstances, the suppression of Jennifer McKay's identification of the appellee on the surveillance video tape would have been erroneous for any of four separate reasons, any one of which would require the remand of this case for further proceedings.

## The Exclusionary Versus The Balancing Approach

We would hold, were the <u>arguendo</u> hypothetical before us for decision, that the exclusionary act of suppressing Jennifer McKay's identification of the appellee on the surveillance tape was error, at least without compelling reasons to do so. There is no question but that the suppression court's ruling was one of <u>per se</u> exclusion: "I will grant the Defense's motion to suppress the out of court identification." It is conceivable that there might be, sometime and somewhere, an impermissibly suggestive identification resulting in the "very substantial likelihood of an irreparable misidentification." It is prudent, therefore, never to say "never." Short of such an extreme situation, however, the exclusionary approach is in strong disfavor, certainly since the promulgation of <u>Manson v. Brathwaite</u> in 1977. Under the totality of circumstances approach, the jury would have been able to balance the many reasons why Jennifer McKay's identification of the appellee would have been reliable against any reasons why they might not. It was error for the court to shortchange the efficacy of the weighing or balancing process. Notwithstanding any police pressure brought to bear on Jennifer McKay's level of certainty, we cannot see a very substantial likelihood of irreparable misidentification, and nothing short of that could justify excluding McKay's testimony.

## A Reliability Analysis Was Essentially Ignored

Pre-trial hearings challenging the propriety of identification procedures are frequently referred to as "taint hearings." The primary purpose of such hearings is not to discover taint and then to sanction the police for having tainted the identification by excluding the evidence. The predominant purpose is to give the State the opportunity to purge any initial taint by showing that the ultimate identification is, notwithstanding the taint, nonetheless reliable (to wit, untainted).

Since the promulgation of Simmons v. United States in 1968, it has been perspicaciously clear that the factfinding jury should not be denied the knowledge of an identification unless the identification procedure was 1) suggestive, 2) impermissibly so, and 3) that there is a very substantial likelihood of an irreparable misidentification. As it has blossomed forth in Neil v. Biggers and Manson v. Brathwaite, that probing of ultimate reliability is now at the heart of constitutional identification law.

It is evident from a close reading of the record of the suppression hearing in this case that the hearing focused almost exclusively on the behavior of the police and ended up with the conclusion that the police behavior had been impermissibly suggestive. The decisive focus was on the suggestive language of the police interviewer.

From start to finish, the focus of the suppression court was on the suggestive behavior of the police—and it stopped there. At one point, the State wanted to call Jennifer McKay to explain her reaction to the police interview. In denying that request, the court explained:

> THE COURT: I just don't see whether that changes your position with regard to whether the police were impermissibly suggestive in the way they conducted this interview.

27

(Emphasis supplied).

The court reiterated that "the conduct that occurred on this video is the only thing we're talking about." (Emphasis supplied). Moments later, the court reiterated its view that Jennifer McKay's state of mind was not a factor in the exclusionary equation.

> THE COURT: Right. I agree with [defense counsel]. I'm going to deny your request to call -- because what her state of mind is --
>
> [PROSECUTING ATTORNEY]: That's fine.
>
> THE COURT: -- has nothing to do with whether the police conduct was impermissibly suggestive.

(Emphasis supplied).

At another point, the court observed, "The burden was always on the State to prove that it was not impermissibly suggestive." (Emphasis supplied). At yet another point, the court rejected the idea that Jennifer McKay's state of mind could have any redemptive influence once impermissible suggestiveness had been found:

> THE COURT: I accept -- even if I accept that she was in shock that it could be somebody that she knew that murdered somebody else that she knew, it doesn't impact whether the police were impermissibly suggestive.

(Emphasis supplied).

Ultimately, the court ruled that Jennifer McKay could testify as to her state of mind during her police interview.

> If I understand Jones, which I have reviewed a long time ago, what Jones is saying is once I determine that suggestiveness, that the identification was suggestive, then you have an opportunity to present the totality of the circumstances to demonstrate that it's still reliable.

28

On being called to the stand, Jennifer McKay explained that she was sure about her identification of the appellee on the tape, and explained that any hesitation on her part was because of her disbelief that someone she once had loved could commit this murder of her live-in boyfriend.

Q. So -- and what happened? Explain -- when you looked at the video, if anything?

A. I saw Daniel Greene on the video in the back like alleyway of his -- of Jon's apartment complex.

Q. Now do you recall on December 4th, 2017, was there -- on December 4th, 2017, when you looked at the video, is that how quickly you said it was Daniel Greene?

A. No, it took me some time to come to that conclusion.

Q. Can you explain to Her Honor why that is or what was -- what you were thinking or what was going on in your mind?

A. I mean I was in doubt that somebody that I loved at one point in time was capable of committing murder.

Q. And -- okay. Did --

THE COURT: Right. But what did that have to do with the identification in the video?

MS. MCKAY: Yes. I mean it took me some time to -- to come to the realization that I was in belief that it was him. But yes, when I looked at the video I was able to identify him.

After rigorous cross-examination by defense counsel, the court announced that "the only thing that I need to decide, my issue today, is was the police conduct impermissibly coercive in forcing Ms. McKay to pick out the defendant. That's the only issue for me."

29

(Emphasis supplied). The focus of the court continued to be on impermissible suggestiveness.

> THE COURT: [Prosecuting Attorney], I am not challenging Ms. McKay. She in effect is somewhat of a victim in this case. <u>What this goes to is the police conduct with regard to how they conducted this identification. So would you address your remarks to whether the conduct of the police was impermissibly suggestive?</u>

(Emphasis supplied).

At the very end of the court's analysis, there was a passing and unadorned mention that "it's not a reliable identification" but nothing more in that regard.

> THE COURT: Okay. Now here's how this court after viewing the video sees this case; that the -- if the police had come in and said, here's the video, can you tell us who's in the video and she says I'm not sure, it's not very clear. I'd let it in. If the police said, okay, well, let's go get the still pictures and maybe you can see it more clearly, that would be fine too. <u>But when they cross the line and say, now look, Daniel has a beard, that guy has a beard. Daniel has a nose. Do you see the nose? It's the same nose. And they lead her to make a positive identification. That is suggestive.</u>
>
> Additionally, under the totality of the circumstances in this case, they're not asking her do you know Daniel. They're asking do you know the person that's in this video. And as [defense counsel] points out, that is in effect stranger to stranger because if she comes in not knowing who that person is and she does it of her own volition make that decision that it is in fact Daniel. <u>And the fact that she comes in today and reinforces the concept that they pushed her and pushed her and then reassured her that it is Daniel at the end of the interview that the State introduced</u>, the next part of the interview where they said, don't worry about it. I know this is hard and <u>they just reinforce and make her more sure that she's picked out the person that they want her to pick out.</u> So for those reasons <u>I find it is suggestive</u> and that <u>under the totality of the circumstances it's not a reliable identification</u> and therefore, <u>I will grant the Defense's motion to suppress the out of court identification.</u>

(Emphasis supplied).

Ultimate reliability was not a meaningful factor in that analysis, if it was, indeed, a factor at all. The conclusion seemed to follow that if the procedure was suggestive, the identification would be ipso facto unreliable without any more detailed analysis. Even granting, arguendo, impermissible suggestiveness in the police interview of Jennifer McKay, it was not nearly as strong as the impermissible suggestiveness found to have existed by the United States Court of Appeals for the Sixth Circuit in Neil v. Biggers. Impermissible suggestiveness, however, was not enough to justify exclusion. After examining the four-fold reliability factors articulated by that case, the Supreme Court reversed the decision of the Sixth Circuit to exclude the identification. By the same token, any possible impermissible suggestiveness in this case was not nearly so strong as that found to have existed by the United States Court of Appeals for the Second Circuit in Manson v. Brathwaite. Once again, however, impermissible suggestiveness was not enough to justify exclusion. After examining in detail the countervailing reliability factor in that case, the Supreme Court did not hesitate to reverse the decision of the Second Circuit to exclude from evidence the identification in that case.

Were a case involving constitutional identification law before us, we similarly would reverse the decision of the Circuit Court for Baltimore City in the present case. The court did not undertake a serious assessment of whether, beyond impermissible suggestiveness, there was "a very substantial likelihood of irreparable misidentification."

### An Erroneous Or A Clearly Erroneous Hypothetical Finding

Were this, arguendo, a case of selective identification and were our framework of analysis, arguendo, the constitutional identification law that has been promulgated by the

31

Supreme Court, we would find error for yet another reason. The suppression hearing court necessarily found, pursuant to <u>Simmons v. United States</u>, <u>Neil v. Biggers</u>, and <u>Manson v. Brathwaite</u>, that Jennifer McKay's identification of the appellee was, by a very substantial likelihood, an irreparable misidentification. Such a finding, we hold, would have been clearly erroneous.

There was no evidence of any misidentification having been made in this case. After first viewing the video camera surveillance tape, Jennifer McKay identified the appellee as the man pictured on the tape. At the end of the protracted police interview of her, Jennifer McKay continued to identify the appellee as the man pictured on the tape. That never changed. No police pressure or influence ever caused her to select anyone other than the appellee. The only thing that arguably might have changed (it appears to us not to have changed) was the degree of certainty with which Jennifer McKay made the identification. All of the alleged police suggestiveness was aimed at Jennifer McKay's level of certainty. The statement, "I think that is the appellee" and the statement, "I know that is the appellee" are both relevant evidence helping the jury to conclude that the man pictured on the tape is, indeed, the appellee. The difference between the two levels of certainty goes only to the weight of the evidence and not to its relevance and, therefore, its admissibility. "I think so" is just as relevant as, "I know so." 60% certainty is just as relevant as 95% certainty. Not nearly as weighty, of course, but just as relevant. Sliding up and down the certainty scale does not alter the substantive nature of the thing one is either very sure about or perhaps only tentatively sure about.

Weight, of course, is classic grist for the jury mill. Improperly to strengthen the certainty of an identification (just as, for that matter, improperly to weaken the certainty of an identification) does not transform an identification into a misidentification. It may, indeed, be a case of the improper coaching of a witness (by the police, by the prosecuting attorney, by the defense attorney, by anyone) but that is an entirely different matter than giving hints as to the selection of this person over the selection of some other person. It is not something, moreover, that has been argued on this appeal. As this Court pointed out in Conyers v. State:

> To do something impermissibly suggestive is not to pressure or to browbeat a witness to make an identification but only to feed the witness clues as to which identification to make. THE SIN IS TO CONTAMINATE THE TEST BY SLIPPING THE ANSWER TO THE TESTEE.

115 Md. App. at 121 (emphasis in original).

Under no circumstances, moreover, could an identification of the appellee by Jennifer McKay be inherently unreliable. The appellee and Jennifer McKay had known each other since childhood. They had lived together in a husband-wife relationship for five years, breaking up only recently before the appellee, as the ex-live-in-boyfriend shot and killed the new live-in-boyfriend. The appellee and Jennifer McKay had been in communication since that break-up. Under any set of criteria, any identification she made of him would be inherently reliable and thus, under Simmons v. United States, Neil v. Biggers, and Manson v. Brathwaite would not call for exclusion.

The inability even to apply Neil v. Biggers's reliability factors to the circumstances of this case simply illustrates the overriding reality that this is not truly an identification

case at all, but rather a case involving, at worst, the improper or excessive coaching of a witness. Because this confirmatory identification does not in any way involve the identification of a criminal by a victim or other witness to the crime, the <u>Neil v. Biggers</u> reliability factors are utterly inapposite. The square peg of <u>Neil v. Biggers</u> specifically or of constitutional identification law generally simply do not fit into the round hole of this case. That makes the point yet again that, despite some surface similarities, this is not truly a case involving identification law at all. This case would be the same if the arguably improper coaching by the police of Jennifer McKay had been about a dozen other subjects not remotely involving a confirmatory identification of the appellee. It might have been the time of day or whether the front door had truly been locked. In any event, a finding of circumstances giving rise to a very substantial likelihood of an irreparable misidentification would have been clearly erroneous and, therefore, reversible.

Actually, it is almost certainly not the "clearly erroneous" test that we should be applying at this point, even in analyzing our <u>arguendo</u> alternative. Although the Supreme Court has not given us express guidance in this regard, it is, from the very language of the ultimate reliability test itself, almost certainly the case that a conclusion by a suppression hearing judge that a particular identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification is not a finding, as a matter of fact, but a ruling, as a matter of law, that the identification in issue will not be permitted even to go to the jury for its weighing and balancing. Whether, however, the suppression hearing judge in this case was erroneous, as a matter of law, or clearly erroneous, as a matter of fact, really does not make any difference. In either event, a remand

34

is required. For future guidance, however, we would opt for considering this to have been a ruling, as a matter of law, subject to <u>de novo</u> right or wrong appellate review.

### Excluding The In-Court Identification
### As Well As The Pre-Trial Identification

Immediately after the court suppressed the out-of-court identification, the State inquired about a subsequent in-court identification. There was no argument by counsel on the subject or even discussion. The in-court suppression followed the out-of-court suppression almost automatically.

> THE COURT: . . . .So for those reasons I find it is suggestive and that under the totality of the circumstances it's not a reliable identification and therefore, <u>I will grant the Defense's motion to suppress the out of court identification.</u>
>
> Now let's go onto the motion to suppress the searches.
>
> [PROSECUTING ATTORNEY]: <u>Is Your Honor preventing her to do an in court looking at the video?</u>
>
> [DEFENSE COUNSEL]: Yes, that was the whole court's --
>
> THE COURT: <u>That was the whole point.</u>
>
> [PROSECUTING ATTORNEY]: Well, you said out of court. So -- then the State, Your Honor, at this moment there's no -- the State would ask Your Honor to stay the proceedings so we can --
>
> THE COURT: No, denied, denied.

(Emphasis supplied).

If nothing else needed to be considered in assessing subsequent in-court reliability, how about the adjective "irreparable"? What was in play in this case, of course, was the degree of certainty of Jennifer McKay's identification of the appellee as the figure on the

surveillance tape. If police questioning arguably had the effect of ratcheting the certainty dial upward, might not strong, forceful, and persuasive cross examination by defense counsel probably have ratcheted the dial back downward again? Would not such a vulnerability to countervailing pressures make any arguable "misidentification" a "reparable" one rather than an "irreparable" one? The deliberate use of the adjective by the Supreme Court was not random or accidental. It is a key component of the constitutional reliability factor. Would the appellee have us simply ignore the adjective "irreparable"?

Might not any uncertainty about Jennifer McKay's level of assurance be explained by showing the jury, in court, the very security cam tape that she had been shown by the police? Is it possible that the images of the suspect on the tape were from a distance? Or in the dark? Or such circumstances where colors might be subject to change? Might a blurred or murky image have been such that one would have difficulty identifying a picture of oneself? In any event, could looking at the tape itself have thrown helpful light on Jennifer McKay's level of certainty? Might not this have made even equivocal testimony reparable?

By showing the surveillance tape to the jury, the jurors would have had a chance to compare Jennifer McKay's ability to make an identification with their own. They would be viewing the same tape that she had viewed. They would be comparing the image on the tape, blurry or clear, with the person sitting immediately in front of them at the trial table. If that were not sufficient, the appellee could have been directed to walk over immediately in front of the jury box, to bend over, to turn around, etc. This might have made the apparently irreparable reparable. Once again, we hold that the suppression of an in-court identification was in error.

36

## Conclusion

Our basic holding is that this case is not a case involving constitutional identification law at all, but a case rather of the arguably improper or excessive coaching of a witness, a contention that is not before us. Even if, however, it were, purely <u>arguendo</u>, a case involving classic identification law, we would rule that the suppression order would have to be reversed and the case remanded for further proceedings.

**SUPPRESSION ORDER REVERSED AND CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLEE.**